UNITED STATES v. HOUSTON BELT & TERMINAL RY. CO.

(Circuit Court of Appeals, Fifth Circuit. May 5, 1913. Rehearing Denied June 2, 1913.)

No. 2,396.

1. MASTER AND SERVANT (§ 13*)—RAILROADS—OPERATION—HOURS OF SERVICE LAW—"ORDERS."

Hours of Service Law (Act Cong. March 4, 1907, c. 2939) § 2 (34 Stat. 1415 [U. S. Comp. St. Supp. 1911, p. 1321]), provides that no interstate railroad company shall permit an operator, train dispatcher, or other employé, who by the use of the telegraph or telephone dispatches, reports, transmits, receives, or delivers "orders" pertaining to or affecting train movements, to remain on duty longer than 9 hours in any 24-hour period, in towers, offices, places, or stations continuously operated night and day. Held, that the word "orders," so used, was not limited to train orders emanating from the train dispatcher's office, which are required to be reduced to writing and handed to the conductor and engineer of a train, but included telephone communications between towermen by which switches were aligned to facilitate the movement of trains according to the information so transmitted.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. § 13.*

For other definitions, see Words and Phrases, vol. 6, pp. 5017–5023; vol. 8, p. 7739.]

2. MASTER AND SERVANT (§ 17*)—HOURS OF SERVICE—RAILROADS—ACTION FOR PENALTY—NEGATIVING EXCEPTIONS.

The Hours of Service Law (Act Cong. March 4, 1907, c. 2939, 34 Stat. 1415 [U. S. Comp. St. Supp. 1911, p. 1321]) restricts the hours of service of telegraph and telephone operators, dispatchers, etc., on interstate railroads transmitting train orders, except in case of emergency, when such employés may be permitted to remain on duty for 4 additional hours in a 24-hour period not exceeding 3 days in any week. Held, in an action to recover a penalty for violating such act, plaintiff was not bound to negative the exception, but the burden was on the defendant to prove that the case was within the exception as matter of defense.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 16; Dec. Dig. § 17.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Error to the District Court of the United States for the Southern District of Texas; Waller T. Burns, Judge.

Action by the United States of America against the Houston Belt & Terminal Railway Company. Judgment for defendant, and the United States brings error. Reversed and remanded.

Lock McDaniel, U. S. Atty., of Houston, Tex., and Philip J. Doherty, Sp. Asst. Atty. Gen., of Washington, D. C., for the United States.

Coke K. Burns, of Houston, Tex., for defendant in error.

Before PARDEE and SHELBY, Circuit Judges, and FOSTER, District Judge.

FOSTER, District Judge. The United States filed suit against the Houston Belt & Terminal Railway Company to recover certain penalties for alleged violations of what is known as the Hours of Service Act. At the close of the evidence each side requested the court to direct a verdict in its favor. The court granted the motion of the railroad, and overruled that of the United States. Both of said rulings are assigned as errors.

The part of the statute pertinent to the issue is as follows:

" * * * No operator, train dispatcher, or other employé, who by the use of the telegraph or telephone dispatches, reports, transmits, receives or delivers orders pertaining to or affecting train movements, shall be required or permitted to be or remain on duty for a longer period than nine hours in any twenty-four hour period in all towers, offices, places and stations continuously operated night and day. * * * "

See Act March 4, 1907, c. 2939, § 2, 34 Stat. 1415 (U. S. Comp. St. Supp. 1911, p. 1321).

The following facts are undisputed: Defendant is a common carrier engaged in interstate commerce and operates two signal towers in its yard at Houston. Tower No. 1 is about 400 yards from the main station and the train dispatcher's office, and tower No. 2 is about three-quarters of a mile further out around a curve. The towers are not visible from each other and are connected by telephone, which, however, has no connection with the train dispatcher's office or any other points. Each tower controls about 25 switches and a double track main line connects with them. The towers are operated continuously day and night. Two operators are employed in each tower, each working 12 hours continuously, and the towermen communicate with each other over the telephone.

The purpose for which the telephone is used and the general method of operating the yards can best be shown by excerpts from the testimony of the towermen. Pease testified:

"Q. What are your duties in these towers? A. To handle switches and derails, and we were operating them by electricity and keep these trains moving as near as possible. Q. State what the man at tower No. 2 did when you notified him there was a train that was passing tower No. 1, if you know? A. That would be impossible for me to know what he did at that time, not being able to see him, but he should have—if I told him a train was going, going to the roundhouse, he should have lined up for the roundhouse; and if

I told him it was going south, he should have given him the main line. Q. It was his duty to do that? A. Yes, sir. Q. Mr. Pease, suppose there is a transfer of cars coming from tower No. 2 in the direction of tower No. 1. What authority governed the disposition of these cars? A. The foreman of the crew. Q. Where does the foreman get his authority? A. From the yardmaster. Q. Where does the yardmaster get his authority? A. From the trainmaster. Q. Then, suppose there is a transfer of cars coming by tower 2 in the direction of tower 1, as I understand the foreman would tell the man at tower No. 2 the disposition to be made of that transfer of cars? A. Yes, sir. Q. Then the towerman at tower No. 2 would call you and inform you of the disposition? A. Yes, sir. Q. Then was it not your duty to make the disposition of the cars that was given to you over the telephone? A. It would be my duty to move that train according to the instructions I received over the telephone, if possible to move it that way, if there was not something else already occupying the block. Q. Suppose the information was that this transfer of cars was to go on the freight lead down near your tower, you acted in accordance with that instruction, and placed the cars on the freight lead, did you not? A. Yes, sir. Q. Did you have to obey that communication because this towerman had told you? Did he have a right to command you to do that? A. No, sir; he had no authority over me, but I would move this train according to his instructions as my duty, not as him having authority over me."

### Myers testified:

"Q. What use was the telephone put to while you were there? A. Well, to call up the other towerman and tell him what was coming. Q. Would they make the same use of the telephone there as to telling you what was coming in your direction? A. Yes, sir; tell us also what was coming, and if possible where they were to go or to be routed. Sometimes there was a case where you would not exactly know, but whenever you could you routed them. Q. What would they tell you over the telephone in regard to a certain transfer or train that was coming in your direction? A. The operator would tell me whatever signal he got from the crew, and if it was a passenger train he would say such and such a train was coming, and that would give me time to hold the switch engines and other trains and line up for that train. Q. What was the practice at that time when it became necessary to run trains in both directions over the same track, going in each direction? A. It is a double track between the two towers, and in case one track is out of service, or the track may not be out of service, but the train broken down, or something, and we had to operate engine on north-bound and south-bound track, over one track, one towerman would call up the other towerman and tell him engine so and so is coming north on the wrong main, and to hold everything until the arrival of this engine number so and so, and vice versa; if anything was going the other way, he would say hold everything until the arrival of this train or engine."

### McAlexander testified:

"Q. What would you say to the towerman in the other tower over the telephone? A. Well, I would tell him that such and such a train was leaving the depot and some engine was going to the roundhouse on the main line. Q. In case where one track was being used; that is, when traffic was running against the current of traffic, or the trains running in both directions on one track, what communication would you have then? A. Well, in case they would do that I would call up the towerman at tower No. 2 and find out if anything was coming in that direction on that track, if we were using one track for traffic in both directions, and I would call up and find out whether there was anything coming in there, and, if so, I would hold my train or engine up there until the other arrived, but, if there was nothing coming at all, I would tell him to hold the track until this train had arrived. Q. How would he indicate that to the foreman in charge of the train he was to hold? A. How would it indicate it? Q. Yes, sir. A. By board. Q. By block? A. Block signal; yes, sir."

Golden testified:

"Q. What communication would you have with the towerman at No. 1 when a train passed your station coming into his station? A. Well, when the train passed over what we call the 'Buzzer,' about a mile and a half south of the tower, I would ring up the tower and tell him train number so and so had passed over the 'Buzzer,' or if the train was late or something, I even might wait until they would get to the tower, and then I would call him up and say train so and so had passed the tower. Q. In case only one track was being used for the passage of trains, and the other track was not being used, what communication would you have with the man in tower No. 1? A. I would call up the towerman of tower No. 1 and tell him that there was trouble on south—say north-bound track, and I would have to run trains on the south-bound track. Q. Going north? A. Yes, sir; going north, and I would ask him if he had anything coming south, and, if there was not, to hold everything until engine number so and so, with or without a train, arrived at tower No. 1. Q. Under the same conditions, if a train was coming by you from the north, would the operator at tower No. 1 give you the same instructions? A. Yes, sir. Q. What would you do then? A. If there was any train due there going north, I would hold this signal against them until the train he had designated had arrived at tower No. 2. Q. In what way would you communicate this order to the trainmen? A. By holding the signal against them."

This testimony is not disputed, but the ultimate facts to be deduced are.

[1] It is contended on behalf of the railroad company that the word "orders" in the statute must be construed to mean what the railroads technically call "train orders"; that is, such orders as emanate from the train dispatcher's office, and are reduced to writing and handed to the conductor and engineer of a train. We cannot agree with this contention. To do so would be to pervert the plain meaning of the statute. An order affecting train movements may be given by a wave of the hand or the flash of a lantern, and its disobedience might cause as dire consequences as the failure to obey a written message. Necessarily an order affecting train movements can be given by any subordinate having to do with trains and switches, such as a towerman.

The railroad further contends, however, that the telephone between these towers is not used to transmit "orders" in any sense of the word. Regarding this, it is evident, from the testimony of the towermen quoted above, that they use the telephone to repeat signals from the trainmen which indicate the routing of the train as originally made by the trainmaster; that they give information over it that trains have started, on receipt of which information the other towerman must throw switches, line up tracks, and hold other trains, as a matter of duty and without discretion on his part; and that they run trains in both directions over a single track and instruct the other towermen by the telephone as to holding traffic. It is therefore evident that these towermen use the telephone to dispatch, report, transmit, receive, and deliver orders appertaining to, or affecting, train movements. To say that these towermen only used the telephone for the giving of information not covered by the statute, would be the merest sophistry. Indeed, it is difficult to conceive how anything could be a more imperative order affecting train movements than for one towerman to notify

another that he had started a train, at the same time telling him to hold all traffic in the opposite direction over the same track.

[2] The railroad still further contends that the rulings of the court were correct, because plaintiff did not negative that the acts and conduct of the defendant complained of came within the exception of the act, which reads as follows:

"* * * * In case of emergency, when the employés named in this proviso may be permitted to be and remain on duty for four additional hours in a twenty-four hour period on not exceeding three days in any week."

We are again forced to disagree. The action, though for a penalty, is civil in its nature, and the pleader is not required to state his cause of action with the exactness and particularity that would be necessary in a criminal indictment. In the nature of things, in most cases arising under the act, facts bringing the case within the exception would be only within the knowledge of the railroad, and the government should not be required to allege that of which it knows nothing simply to conform to a mere technicality of pleading. If facts existed that would bring the case within the exception, they constituted a defense that the railroad should have pleaded and proved. See New York Central & Hudson River Railroad Co. v. United States, 165 Fed. 833, 91 C. C. A. 519; United States v. Kansas City Southern Railway Co. (C. C. A.) 202 Fed. 828.

We must hold that both assignments of error are well taken. The judgment is reversed, and the case remanded for a new trial.