MISSOURI PAC. RY. CO. v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. February 16, 1914.)

No. 4033.

MASTER AND SERVANT (§ 13*)—RAILROADS—OPERATION—HOURS OF SERVICE LAW—CONSTRUCTION—"OTHER EMPLOYÉ."

Hours of Service Act, § 2 (Act March 4, 1907, c. 2939, 34 Stat. 1416 [U. S. Comp. St. Supp. 1911, p. 1321]), makes it unlawful for any carrier subject to the act to permit any employé subject thereto to remain on duty for a longer period than 16 consecutive hours in any 24-hour period, provided that no operator, train dispatcher, or other employé who by use of telegraph or telephone dispatches, reports, transmits, receives, or delivers orders pertaining to train movements, shall be permitted to remain on duty for a longer period than 9 hours in any 24-hour period in towers, offices, places, and stations continuously operated day and night. *Held* that, under the rule ejusdem generis, the words "other employé" should be construed to mean an employé of the same class, engaged primarily in the same class of service as would be performed by an operator or train dispatcher; and hence servants employed by a railroad company as switch tenders, whose duty was to operate certain hand switches regulating trains in accordance with directions given them by telephone connected with a shanty erected at their place of employment, were not "other employés" within the statute, so that the railroad company was not liable for a penalty thereunder for requiring them to labor more than 9 hours a day.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. § 13.*

Hours of service of employés, see note to United States v. Houston Belt & T. Ry. Co., 125 C. C. A. 485.]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Error to the District Court of the United States for the Western District of Missouri; Arba S. Van Valkenburgh, Judge.

Action by the United States of America against the Missouri Pacific Railway Company. Judgment for the United States, and defendant brings error. Reversed, and new trial ordered.

Edward J. White, of Kansas City, Mo. (Martin L. Clardy, of St. Louis, Mo., on the brief), for plaintiff in error.

Philip J. Doherty, of Washington, D. C. (Francis M. Wilson, U. S. Atty., of Platte City, Mo., and Thad B. Landon, Sp. Asst. U. S. Atty., of Kansas City, Mo., on the brief), for the United States.

Before SANBORN and CARLAND, Circuit Judges, and RINER, District Judge.

CARLAND, Circuit Judge. This is an action by the United States against the railway company to recover penalties for a violation of the "Hours of Service Act, 34 Stat. 1415." The complaint contained ten counts which alleged violations of section 2 of said act, by the company, in requiring and permitting R. Connell and J. W. King, alleged to be telegraph operators and employés, to be and remain on duty for a longer period than 9 hours in certain 24-hour periods, occurring from August 1 to 6, 1912, at Kansas City, Mo. At the close of all the evidence, the trial court, at the request of counsel for the United States, directed a verdict against the company. This ruling of the court is assigned as error. The facts appearing at the trial were undisputed, and the only question for decision is as to whether the facts showed that R. Connell and J. W. King were operators, train dispatchers, or other employés, who by the use of the telegraph or telephone dispatched, reported, transmitted, received, or delivered orders pertaining to or affecting train movements. Upon this question the evidence established these facts: R. Connell and J. W. King were employed by the company as switchtenders, and they performed the duties of switchtenders and those alone. They performed their work at a shanty located at the junction between a track of the company leading to Kansas City, Kan., and the track leading up quite a steep incline to the Union Station at Kansas City, Mo. They operated ten low hand switches. There were telephones in the shanty. One of these phones connected with Grand avenue, the Burlington tower, the Union Depot, and the Union Depot tower. Another connected with Troost avenue and Henning street. Trains which desire to enter the Union Depot cannot always do so on account of the limited trackage and space therein, and on account of the incline extending from the junction, above mentioned, up to the depot, trains find it impracticable to stop at the foot of the incline and have the switches thrown, and therefore the men operating any of the trains always desire to know whether there is room for it in the Union Depot, and as to whether the switches are so situated as to allow a continuous run, when, for instance, the train reaches as near as Grand avenue. On the other hand, trains departing from the Union Depot for the East when desiring to know if the track is clear, a man at the Burlington tower asks R. Connell or

J. W. King about it and receives the desired information. When all is said about the duties of these men, it comes to this: Their primary duty was to throw these switches whenever necessary, and the telephones were used to inform them from time to time what was wanted in regard to the switching and in reporting to those who intended to use the switches, the preparation that had been made for such use. It did not differ except in complexity of operation from the service performed by a brakeman who runs ahead of his train, turns a switch, and swings his hand by day, or lantern by night to signal the engineer. If one is within the proviso of section 2, so is the other, unless it be held that the mere use of the telephone brings one switchman within the 9-hour provision and leaves another who does not use it under the 16-hour clause, although the service performed is the same. But we apprehend that there will be no contention that Congress fixed the period of 9 hours for certain employés because of the use of the telephone. The difference in the hours of labor fixed by section 2 was based upon the character of the service rendered by the employé, not upon the use of the telephone. R. Connell and J. W. King, beyond question, were not operators or dispatchers. They were employés, but were they employés within the meaning of section 2, who by the use of the telegraph or telephone dispatched, reported, transmitted, received, or delivered orders pertaining to or affecting train movements? There can be no doubt about the purpose of the statute. Baltimore & Ohio R. Co. v. I. C. C., 221 U. S. 612, 30 Sup. Ct. 86, 54 L. Ed. 164; United States v. Kansas City Southern Ry. Co., 202 Fed. 832, 121 C. C. A. 136; St. Louis, I. M. & S. Ry. Co. v. McWhirter, 145 Ky. 427, 140 S. W. 672; United States v. Chicago, Milwaukee & P. S. Ry. Co. (D. C.) 197 Fed. 624. We must take its language as the best evidence of the intention of Congress and bring to bear upon the language used, established canons of statutory construction so far as applicable, keeping in view the declared purpose of Congress, namely, the promotion of the safety of employés and travelers. Section 2 of the act, so far as material, reads as follows:

"That it shall be unlawful for any common carrier, its officers or agents, subject to this act to require or permit any employee subject to this act to be or remain on duty for a longer period than sixteen consecutive hours, and whenever any such employee of such common carrier shall have been continuously on duty for sixteen hours he shall be relieved and not required or permitted again to go on duty until he has had at least ten consecutive hours off duty; and no such employee who has been on duty sixteen hours in the aggregate in any twenty-four hour period shall be required or permitted to continue or again go on duty without having had at least eight consecutive hours off duty: Provided, that no operator, train dispatcher, or other employee who by the use of the telegraph or telephone dispatches, reports, transmits, receives, or delivers orders pertaining to or affecting train movements shall be required or permitted to be or remain on duty for a longer period than nine hours in any twenty-four hour period in all towers, offices, places, and stations continuously operated night and day."

The law quoted first provides that it shall be unlawful for any common carrier to require or permit any employé to be or remain on duty for a longer period than 16 consecutive hours. Then the proviso of

the section takes out of all the employés of the common carrier a certain class, namely, operators, train dispatchers or other employés who by the use of the telegraph or telephone dispatch, report, transmit, receive, or deliver orders pertaining to or affecting train movements. The proviso ought not to be construed so broadly as to annihilate the general language of the section. We think that under a well-established rule of construction the words "or other employé," found in the proviso, must be construed to mean an employé engaged in the same character of service as a train dispatcher or operator, who by the use of the telegraph or telephone performs the work described in the proviso. In other words, Congress intended the 9-hour provision to apply to employés whose primary duty was to dispatch, report, transmit, receive, or deliver orders pertaining to or affecting train movements. We do not mean by this that the word "orders" should be limited to technical train orders described in what are known as standard rules for the movement of trains. Congress was dealing with a class of employés engaged primarily in a particular service and the mere form of the order, pertaining to or affecting train movement, is immaterial if it is dispatched, reported, transmitted, received, or delivered by the use of the telegraph or telephone. Where general words follow an enumeration of particular classes of persons or things, they will be construed as applicable only to persons or things of the same general nature or class as those enumerated. The particular words are presumed to describe certain species and the general words to be used for the purpose of including other species of the same genus. The rule is based on the obvious reason that, if the Legislature had intended the general words to be used in their unrestricted sense, they would have made no mention of the particular classes. The words "other" or "any other," following an enumeration of particular classes, are therefore to be read as "other such like," and to include only others of like kind or character. First National Bank of Anamoose v. United States, 206 Fed. 374, 379, 124 C. C. A. 256, 46 L. R. A. (N. S.) 1139; Cyc. vol. 36, p. 1120, and cases cited.

The principle involved is illustrated by the case of United States v. Bevans, 3 Wheat. 336, 4 L. Ed. 404. In this case William Bevans was indicted for murder in the United States Circuit Court for the District of Massachusetts. The offense was alleged to have been committed on November 6, 1816, on board the United States ship of war Independence, lying at anchor in the main channel of Boston Harbor. After trial and conviction, the judges holding the Circuit Court, being divided in opinion as to their jurisdiction, certified the question to the Supreme Court of the United States. The third section of the act of Congress of April 30, 1790, c. 9, 1 Stat. 112, provided:

"That if any person or persons shall, within any fort, arsenal, dockyard, magazine, or in any other place or district of country, under the sole and exclusive jurisdiction of the United States, commit the crime of willful murder, such person or persons on being thereof convicted shall suffer death."

Jurisdiction in the Circuit Court was claimed upon two grounds: First, that the place where the murder was committed was within the admiralty and maritime jurisdiction of the United States; second, that

the United States ship of war Independence was a place, within the sole and exclusive jurisdiction of the United States. In reference to the last contention, Chief Justice Marshall, in delivering the opinion of the court, said·

"The objects with which the word 'place' is associated are all, in their nature, fixed and territorial. A fort, an arsenal, a dockyard, a magazine, are all of this character. When the sentence proceeds with the words, 'or in any other place or district of country under the sole and exclusive jurisdiction of the United States,' the construction seems irresistible that, by the words 'other place,' was intended another place of a similar character with those previously enumerated, and with that which follows. Congress might have omitted, in its enumeration, some similar place within its exclusive jurisdiction, which was not comprehended by any of the terms employed, to which some other name might be given; and therefore the words 'other place,' or 'district of country,' were added; but the context shows the mind of the Legislature to have been fixed on territorial objects of a similar character."

As the word "employé" in the proviso of section 2 includes "operator" and "train dispatcher," for the latter are both employés, the conclusion here is irresistible that Congress intended by the use of the words "other employé" to mean an employé engaged primarily in the same class of service as would be performed by an operator or train dispatcher. If this be the right construction to place upon the proviso, then R. Connell and J. W. King were not in any sense employés, whose primary duty was to dispatch, report, transmit, receive, or deliver by the use of the telegraph or telephone orders pertaining to or affecting train movements within the meaning of the proviso. While, as has been said before, we must give the law such a construction as will promote the purpose of the law, in our zeal to do so, however, we must not attempt to legislate ourselves. We are cited to the case of United States v. Houston Belt & Terminal Ry. Co., 205 Fed. 344, 125 C. C. A. 481. In regard to this case, it is sufficient to say that the facts which appear in the report of that case differ from the facts in the present record.

Judgment below reversed, and a new trial ordered.