## UNITED STATES v. PENNSYLVANIA R. CO.

(District Court, E. D. Pennsylvania. February 14, 1917.)

No. 4042.

1. MASTER AND SERVANT ⬤⇒13—REGULATION—HOURS OF SERVICE—CONSTRUC-
TION OF STATUTE.

The Hours of Service Act (Act March 4, 1907, c. 2939, 34 Stat. 1415
[Comp. St. 1913, §§ 8677–8680]), which was intended to avoid the danger
resulting from exhausted employés, must be liberally construed to repress
the evil and advance the remedy.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14.]

2. MASTER AND SERVANT ⬤⇒13—REGULATION—HOURS OF SERVICE—"EMPLOYÉ
WHO BY TELEPHONE DELIVERS ORDERS."

A yardmaster of a railroad yard, on entering which all trains are re-
quired to be brought into such control that they can be stopped within
the range of vision, to whom the company's rules gave the charge of the
movement of trains within the parts of the yard limits assigned to him,
and whose orders freight conductors are required to obey, and who is
furnished by the railroad with a telephone to use in performing his
duties, is within the provision of the Hours of Service Act, limiting the
time of continuous service of any operator, train dispatcher, or other
employé who by the use of telephone delivers orders pertaining to train
movements.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14.]

At Law. Action by the United States against the Pennsylvania Rail-
road Company to recover the penalty for noncompliance with the
Hours of Service Act. On trial hearing without a jury. Judgment
rendered for plaintiff.

Robert J. Sterrett, Asst. U. S. Atty., and Francis Fisher Kane, U.
S. Atty., both of Philadelphia, Pa.

John Hampton Barnes, of Philadelphia, Pa., for defendant.

DICKINSON, District Judge. This action is to recover the penalty
for a noncompliance with the Hours of Service Act. The sole ques-
tion may be characterized as one of law, involving the proper construc-
tion of the act of Congress, or as an ultimate fact finding of whether
the employés with whom the case concerns itself are engaged in the
kind of train service defined in the act. The case was by agreement
tried before the court without the intervention of a jury, the right to
a trial by jury having been waived. The stipulations entered into dis-
pense with the necessity for any other findings than the one above in-
dicated. This will be determined both as a conclusion of law and as
a finding of fact. There is no controversy over the evidentiary facts.
If either party, however, desires any special findings to be made part
of the record, leave to present requests is granted, and the requests and
answers will be made part hereof.

[1] The question is whether the yardmasters, whose number of
hours of service exceeds that of "operators and train dispatchers,"
should be limited to a like number. The pertinent words of the act
are:

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

"Operator, train dispatcher, or other employé who by the use of the telegraph or telephone dispatches, reports, transmits, receives, or delivers orders pertaining to or affecting train movements," etc.

The general purpose of the act is to provide against the danger described in the phrase "he was asleep at his post," by limiting the hours of continuous service. There is a recognition of the fact that man, regarded as an instrument of service, cannot be an efficient or dependable instrument if exhausted or "dead from loss of sleep." The command had issued to all trial courts to liberally construe this act of Congress so as "to repress the evil and advance the remedy." Baltimore v. I. C. C., 221 U. S. 612; 31 Sup. Ct. 621, 55 L. Ed. 878.

[2] There is also, however, recognition of the fact that railroading is a very practical occupation, the work of which must be governed by a system or organization which is necessarily very complex, and service in which will not readily lend itself to arbitrary time limits. The effort is therefore made to have the act apply to a class having a recognized existence in such systems, and to enlarge it by adding those who perform the kind of service, the hours of which Congress, for the public good, was seeking to regulate. The general thought is clear enough. The persons desired to be reached are those whose duties have to do with "train movements." Inasmuch, however, as in such an organization every one connected with it is working toward the accomplishment of a common end (which necessarily involves "train movements"), the work of every one "pertains to or affects" such movements. Such a designation of the persons meant is in consequence far more broad than intended. The risk which Congress had in mind to minimize is one flowing from the wrong moving of trains, resulting in collisions or other causes of injury to persons and property. Such movements could be made only at the will of some employé. In the final analysis this would be the engineer or other operator of the mechanism, but, as he moves at the direction of some other employé, without exercising any other will of his own than that of obedience, the "order" to move, of which we are in search, comes from such other employé. This other employé, in his turn, does not act, except upon knowledge of the conditions, and this he gathers from information conveyed to him by still others. There is here a distinction. As before observed, there must be a mind which directs the movement. Whenever this is manifested, there is an order to move. The distinction is between the information upon which the mind acts and the act.

There are times when the two are difficult to distinguish, and the one blends into the other, and each becomes both. Take the instance of a train run on schedule and by the block signal system. The signal is both information and an order to the engineer. If it is not against him, it tells him the track is clear, and orders him to run to the next block. If some one, not a signalman, stands on the track waving a flag or his hat, the engineer will stop the train; but this could not be said to be an order to stop. The distinction and the difference and the test are here alike obvious, assuming the general orders to be that the engineer must obey the signal. Where the brakeman of a stalled train goes back to signal a following train, or a switch-

man waves to the engineer after throwing a switch, the distinction remains, and the test is the same, but the difference practically disappears. Railroad parlance supplies us with the required phrase—the brakeman is said "to flag" the train. Another illustration is afforded by a station agent, who informs the engineer that a train ahead of him is in difficulties and may become stalled. Still another is afforded by the rule (not in the Book of Rules) put in evidence by the defendant and relied upon to support the defense. This rule informs those in charge of the train that it is likely to meet other trains within yard limits, and orders them to so run their train as that it may be stopped within the range of their vision.

The test, of course, is whether, in the cases instanced, the engineer uses his own judgment upon the information given, or whether he is without choice, and has no discretion in respect to what he will do. Practical railroading recognizes the distinction and classifies employés accordingly. Dispatchers and operators of block signal towers are recognized as those who direct, and because of this give "orders" for, train movements. Switchmen and brakemen do not give "orders." Congress, wishing to apply the act, not only to those who in the railroad sense directed train movements, but also to those through whose acts trains did in fact move, designated "dispatchers" and "operators" eo nomine, and added all employés whose duty it was to give information which pertained to or affected train movements, through being the practical equivalent of an order. It was at once seen, however, that if the enactment was so phrased the language was entirely too broad and general, and it was because of this limited to those who conveyed the information by telegraph or telephone. There were several reasons for a limitation of this kind. One was that it defined the class with practical precision, and excluded employés not meant to be embraced, because it was impractical to embrace them. Another was that this limitation confined the act to a class who were, because of the character of their employment, required to be mentally alert and wide awake, and were most likely to succumb to the strain of long hours, because they would be without the physical activity which would keep them alert and on the move. This gives us the fair meaning of the act of Congress, and it only remains to apply that meaning to the employés with whom we are now concerned.

In railroad parlance they are neither dispatchers nor operators, nor have they to do with train movements. They are what the name by which they are known implies—"yardmasters." The question, therefore, is whether they are brought into the class by the description of their duties. They are employed, as the name given to them indicates, within the limits of a yard. Within this yard there are tracks set apart for a variety of purposes. They have primary uses and occasional or emergency uses. One such primary purpose and use is to arrange the cars in convenient trains compacted of cars having destinations such as will facilitate deliveries. This is the classification of cars and making up of trains. Another purpose is to store cars. Another is for yard movements. There are also tracks which extend through the yard without being in the strict sense part of it. Two

of these are main tracks used for passenger service having nothing to do with the yard. These others (two known as west-bound, and one as east-bound) are used for freight service, which goes through the yard without being of the yard operations. These three tracks are, however, also used for yard movements (as also are at times even the passenger tracks), and are so used at times without regard to the indicated intended direction of travel. This latter movement is called "bucking the track."

When the tracks, which have been spoken of as extending through (without being part of) the yard, are used for through travel, the movement of the trains is directed by the dispatcher in the usual way. All employés connected with such movements are in the short hours class. Normally these tracks are open to and free for through yard movements. The yard movement of trains is regulated by the special rule and the Book of Rules already mentioned.

The pertinent rule, upon which the defense is based, is that, before spoken of, requiring conductors and engineers to assume, when they enter a yard limit, that they will meet with other cars upon the track, and to so regulate the speed and movement of their train as that they will be able to stop it within the range of their vision. There is also rule 706 and (although not specifically put in evidence) rule 707, hereinafter discussed, referring to yardmasters. To aid and inform such operators of trains, and enable them to regulate and control such movements, the yardmasters are given certain duties to perform and certain instrumentalities to assist them. Structures or buildings are provided at convenient points at which the yardmasters are stationed. These buildings, when necessary, are equipped with telephones and speaking tubes, and the yardmasters are given the assistance of clerks and switchmen or signalmen. They know the track equipment of the yard, and the changing conditions affecting train movements. They are kept informed by being given advance information of what is coming into the yard, and know what is to be done and what tracks can be used and when. They direct what track is to be used and the signal is set accordingly. This indicates to the engineer on what track his train will move and that it is clear. If the intended movement takes the train beyond the point at which the next yardmaster is stationed, the information is passed on to him. The telephone is used by the yardmasters, although they may give the message in other ways and frequently do so. Trains and cars are thus moved to wherever in the yard they are to go, and trains are moved through the yard if the destination is beyond. While moving within yard limits (unless moved by the train dispatcher), the movements are regulated by the before-mentioned rules. This presents the question: Are these yardmasters "employés dispatching, reporting, transmitting, receiving or delivering orders by telephone pertaining to or affecting train movements"?

If the yard rule relied upon by defendant was the only rule which had application, there would seem to be at least room for the argument that "yardmasters" are without the act. It is, however, not the only rule, for we have also rule 706, which seems to be directly in point, and, if so, certainly puts an entirely different phase on the

case, and to expressly classify "yardmasters" among employés who give orders "affecting train movements," for it expressly provides that they "have charge of the movements of trains" within the parts of the yard limits assigned to their charge respectively. Rule 707 fur-. ther provides that freight conductors "must obey the orders of yard-masters."

The argument addressed to us by counsel for defendant is convincing so far as the character of the employés is involved. We are in entire accord with him that yardmasters do not belong to the class of dispatchers or operators who have to do with train movements. If the words "other employés" are to be given this significance, we think the viewpoint of the defendant to be the correct one. Much may be said in support of this. It is a resulting consequence of the ejusdem generis doctrine. We do not think, however, the doctrine to have application. The word "other" is, we think, not used in the sense of "others of the same class," but in the "and also" sense. Congress did not command that train dispatchers and operators and other employés of the same class, but that dispatchers and operators and also all employés, whether of the same class or not, who directed train movements, and who used the telegraph or the telephone in the discharge of their duties, should be subject to this provision of the act. Under rule 706 we feel compelled to find that yardmasters "transmit, deliver and receive by telephone orders pertaining to and affecting train movements."

Following the analysis of counsel for defendant, we find (1) "yard-masters" are included in "other employés," and (2) they give, by authority of rules 706 and 707, orders pertaining to and affecting train movements, and use the telephone for this purpose. The remaining question (3) is whether operations within a yard are "train movements" within the meaning of the act of Congress. If the operations in this yard were confined to that of breaking and making up trains, as distinguished from moving, then we would be able to find that yard-masters moved cars, but not trains. The operations in this yard, however, undoubtedly include the movement of trains in every sense of the word. This we say, mindful of the fact that some of the trains are moved by the dispatcher through the yard, usually on the tracks provided for that purpose, but (should occasion arise for such use) also on any tracks in the yard.

This is a close case. We say this, not only because counsel have so characterized it, but also because the conclusion we have felt compelled to reach is opposed to the impressions received at the trial. As remarked before in other cases, a given case may require us to stand so near the dividing line that its ruling partakes too much of the character of a "rescript" to be altogether satisfying. If we have correctly interpreted the will of Congress, it should be enforced, and the wise public policy imposed by this act should not be obstructed in its operation, unless the rights of others are in the way, and there is no invasion of the rights of the defendant, if the construction placed upon the act of Congress be the true one, as we believe it is.

The findings of facts and conclusions of law to be filed herewith are incorporated herein. Plaintiff may enter judgment in its favor and against the defendant for $100 with costs.

The conclusion reached, we think, to be in harmony with the construction placed upon the act by the Interstate Commerce Commission and with the adjudged cases. I. C. C. Ruling of March 16, 1908, No. 287–D; I. C. C. "Hours of Service" Pamphlet, page 48; United States v. Houston, 205 Fed. 344, 125 C. C. A. 481; Chicago v. United States, 226 Fed. 27, 141 C. C. A. 138; Brooklyn v. United States, 239 Fed. 287, —— C. C. A. —— (Hough, C. J., January 9, 1917, Second Circuit).

We do not understand the ruling in United States v. Erie, 237 U. S. 402, 35 Sup. Ct. 621, 59 L. Ed. 1019, to be in conflict with the construction placed upon the present act. That case involved the Safety Appliance Act. There are air brake, and also automatic coupling and "grabhold," provisions in the act. The court distinguished between these requirements, holding the one to refer to the train and the others to the car, as the unit. The air brake was required only when the company was about "to run a train." This was held to have a different meaning from the intra-yard movement of cars in assembling or classification work in the mere make-up of trains, or in the mere switching operations in the breaking up of trains.

It is worthy of remark, however, that the Supreme Court held (reversing the court below) that the movement of a number of cars forming a train from one yard to another was a train movement within the meaning of the air brake provision, although the yards were so intimately and closely connected that both the District Court and the Circuit Court of Appeals found them to be only one yard.

The general expressions employed in the opinion in Missouri v. United States, 211 Fed. 893, 128 C. C. A. 271, may well be quoted in support of the defense here. We are always, however, as has frequently been observed, to read the language of every opinion in the light of the facts of the case. The case as ruled was that a mere switchman is not within the act, although he, in addition to the work of a switchman, gives by telephone information upon which a train movement is made. His primary duty was to throw a switch. He certainly gave no "orders" by telephone, and there is nothing in the case to indicate that he thus received any. The likeness which the court found between him and the brakeman, who is sent to flag a train, makes clear the thought upon which the ruling was based. The want of likeness between him and a dispatcher emphasizes it. The general expressions used have reference, we think, to the likeness there must be between a dispatcher and the "other employés" meant by Congress. We have held (and we do not find Missouri v. United States necessarily to be read to mean otherwise) that "other employés" does not mean an employé of the same class as dispatchers or an employé who is properly classified as a dispatcher, but means one whose message or act operates as a command to others, or is sent or done in obedience to a command received by him, when the command is electrically trans-

mitted. We have not held that there is no likeness between one designated by the act as operator and one designated as "other employé." There is and necessarily must be a likeness, both with respect to an "order" being transmitted and the mode of transmission. To repeat the attempt to make the distinction clear, we decline to hold that both must belong to the same class, and hold that they are in different classes; but we also hold that there is not only a likeness between, but also an inclusion of one class with the other. "Operators," as named in the act, belong to the "other employés" class; but an "other employé" need not belong to the "operator" class, although there is the likeness indicated. Each is an employé; each gives, receives, or transmits orders; and the transmission to or from each is by telegraph or telephone.

The Missouri case rules that the switchmen in that case did not belong to any of the classes to which the act confines itself. The application of that case to the present one may be summed up in the expression there made use of with respect to the case of United States v. Houston: "The facts of that case differ from the facts of this." The same comment may be made upon the ruling in United States v. Chicago (D. C.) 219 Fed. 1011, and emphasized.

All of these cases recognize, as does United States v. Florida, 222 Fed. 33, 137 C. C. A. 571, the substantial difference, as well as distinction, between a conductor or switchman and the "other employés" whom Congress had in mind. The primary and real character of the employment is not changed by the occasional emergency use of a telephone. Here, again, we are dealing with an entirely different state of facts, as the regular and primary duty of these yardmasters is to direct train movements, and they do so by the use of the telephone.