## Jones v. Louisville & Nashville Railroad Company.

(Decided February 28, 1919.)

### Appeal from Bullitt Circuit Court.

1. Master and Servant—Hours of Service Act.—A section hand sweeping snow from the switches in a railroad yard is not an employe within the Hours of Service Act, which applies only to persons actually engaged in or connected with the movement of trains.

2. Master and Servant—Hours of Service Act.—Sweeping snow from a switch in a railroad yard has no connection with the movement of trains under the act of Congress of March 4, 1907.

C. P. BRADBURY for appellant.

J. F. COMBS, MOORMAN & WOODWARD and BENJAMIN D. WARFIELD for appellee.

OPINION OF THE COURT BY JUDGE QUIN—Affirming.

The appellant, Will Jones, was a section hand, employed by the appellee, and at the time complained of in the petition was engaged in sweeping snow from the switches connected with the tracks in the company's yards at Shepherdsville, Ky., and which include the main tracks of the appellee. Appellant alleges that he was required by the company to work for a period of 24 hours on January 13, 1917, in violation of what is known as the Hours of Service Act, passed by the federal Congress, March 4, 1907, chap. 2939, 34th stat. 1415 (U. S. Comp. St. Supp. 1911, p. 132), and that while so engaged, on account of the excessive number of hours he was required to labor, his feet were frozen and he was permanently injured. The lower court sustained a demurrer to the petition as amended and plaintiff has taken an appeal to this court.

In the first section of the act referred to is this language: ". . . and the term 'employes,' as used in this act shall be held to mean persons actually engaged in or connected with the movement of any train."

Section 2 is as follows: "That it shall be unlawful for any common carrier, its officers or agents, subject to this act to require or permit any employe subject to this act to be or remain on duty for a longer period than sixteen consecutive hours, and whenever any such employe of such common carrier shall have been continuously on duty for sixteen hours he shall be relieved and not required or permitted again to go on duty until he has had at least ten consecutive hours off duty; and no such employe who has been on duty sixteen hours in the aggregate in any twenty-four-hour period shall be required or permitted to continue or again go on duty without having had at least eight consecutive hours off duty; Provided, That no operator, train dispatcher, or other employe who by the use of the telegraph or telephone dispatches, reports, transmits, receives or delivers orders pertaining to or affecting train movements shall be required or permitted to be or remain on duty for a longer period than nine hours in any twenty-four-hour period in all towers, offices, places and stations continuously operated night and day, nor for a longer period than thirteen hours in all towers, offices, places and stations operated only during the daytime, except in case of emergency, when the employes named in this proviso may be permitted to be and remain on duty for four additional hours in a twenty-four hour period on not exceeding three days in any

week; Provided further, The Interstate Commerce Commission may, after full hearing in a particular case, and for good cause shown, extend the period within which a common carrier shall comply with the provisions of this proviso as to such case."

In section 3 it is provided that the provisions of the act shall not apply to the crews of wrecking or relief trains.

The Employers' Liability Act of 1906, which was approved June 11, 1906, 34th Stat. at Large, 232, chap. 3070, embraced and included "any employe of an interstate carrier." Many cases have come before this, and other courts, seeking a construction of said last named statute, as to its applicability to certain named employes, and it has been held to embrace practically every class of persons employed by an interstate carrier, the test being that the employe received his injury "while engaged in interstate commerce for the company." A very full discussion of those embraced in the act will be found in Probus v. I. C. R. R. Co., 181 Ky. 7.

In the employers' liability cases, 207 U. S. 463, 498, in discussing the act of 1906, Mr. Justice White said:

"Thus, the liability of a common carrier is declared to be in favor of 'any of its employes.' As the word 'any' is unqualified, it follows that liability to the servant is co-extensive with the business done by the employers whom the statute embraces; that is, it is in favor of any of the employes of all carriers who engage in interstate commerce. This also is the rule as to the one who otherwise would be a fellow servant, by whose negligence the injury or death may have been occasioned, since it is provided that the right to recover on the part of any servant will exist, although the injury for which the carrier is to be held resulted from 'the negligence of any of its officers, agents or employes.' "

In construing this Employers' Liability Act of 1906, together with the amendments thereto, the court, in Hardwick v. Wabash R. Co., 181 Mo. App. 156, 168 S. W. 328, held that an employe of the company who was doing the same character of work as the appellant in this case, was engaged in interstate commerce and therefore within the act.

It is clear, however, from a reading of the two statutes that congress intended by the Hours of Service Act to restrict and limit the persons to be affected by it, by

confining its provisions to those employes or persons "actually engaged in or connected with the movement of any trains." This fact is emphasized by the provision in section 2 relative to operators, same being limited to operator, train dispatcher "or other employe who by the use of the telegraph or telephone dispatches, reports, transmits, receives or delivers orders *pertaining to or affecting train movements.*"

In discussing the difference between the two statutes above referred to this court in L. & N. R. R. Co. v. Walker's Admr., 162 Ky. 209, thus states: "The Federal Hours of Labor Act, making it unlawful for any carrier to permit an employe subject to the act to be or remain on duty for a longer period than sixteen consecutive hours, defines employes as 'persons actually engaged in or connected with the movement of any train.' Osborne's Admr. v. C. N. O. & T. P. Ry. Co., 158 Ky. 176. But the Federal Employers' Liability Act, providing that the common carriers subject to the act shall 'be liable in damages to any person suffering injury while he is employed by such carrier in such commerce . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents or employes of such carrier' does not undertake to define the meaning of the word 'employed' as used in the act or to describe, except as indicated, the employes to whom the act applies."

Osborne's Admr. v. C. N. O. & T. P. Ry. Co., 158 Ky. 176. Plaintiff's decedent was a brakeman in the employ of the railway company. The main question involved in this case related to the actual time that decedent was on duty, but after referring to rule No. 74, promulgated by the Interstate Commerce Commission, relative to employes dead-heading on trains, the court, in answering the argument that although Osborne did not have any duties to perform in connection with the movement of the train on which he was riding or the movement of any other train, he was, nevertheless, on duty in the sense that he was acting under the orders and directions of a superior and did not have the full and free opportunity contemplated by the statute to take subject to his own volition the rest allowed, says:

"There is much force in this position, and if the act permitted us to do so we would be disposed to say that an employe was engaged in service when he was acting under the orders and directions of a superior, although

these orders or directions might not impose upon him the performance of any particular duty in connection with the movement of any train. But the act is not fairly susceptible of this construction. In carefully chosen words it describes an employe as a person who is 'actually engaged in or connected with the movement of any train,' and the hours of service feature of the act only apply to such a described person. Manifestly Osborne was not actually engaged in or connected with the movement of the train on which he was 'dead-heading,' because the uncontradicted evidence is that he had no duties of any kind or character to perform in connection with the movement of this train and was not charged with any responsibility in relation thereto; nor could he have been engaged in or connected with the movement of the train on which he was to leave Oakdale at 6:15 a. m. the following morning, for the train on which he was riding as a 'dead-head' reached Oakdale at 12:45, and the train on which he was a brakeman was not due to leave there until 6:15 a. m. The hours of service he was engaged in did not begin when he was ordered to 'dead-head' any more than they did when he was called at 5:30 a. m. to leave his boarding house. The plain reading of the act forbids its application to an employe who is not actually engaged in or connected with the movement of any train, and the railroad company does not violate the act, nor does the employe come within its protecting provisions unless it be shown that he was actually engaged in or connected with the movement of the train in the manner we have described for a longer period than the act allows without having the rest allowed by the act.''

What then is meant by the movement of any train? Webster's International Dictionary thus defines the word ''movement:'' Act of moving; change of place, position, or posture; transference or passing from one situation to another; a particular act or manner of moving; as the movement of a wagon; the movement of freight; a system of mechanism for transmitting a definite motion, or for transforming motion.''

The Interstate Commerce Commission on March 16, 1908, issued certain rulings interpreting the act of 1907 as follows:

''The act does not specify the classes of employes that are subject to its terms. All employes engaged in or connected with the movement of any train, as described

in section 1, are within its scope. Train dispatchers, conductors, engineers, telegraphers, firemen, brakemen, train baggagemen, who, by rules of carriers, are required to perform any duty in connection with the movement of trains, yardmen, switch tenders, tower men, block signal operators, etc., come within the provisions of the statute." From the employes enumerated above it is manifest the commission had in mind the same thing, viz.: that the act was not so broad as the Employers' Liability Act, but had a far more restricted meaning, because it would seem that the persons embraced within the act, as interpreted by the Interstate Commerce Commission, were those engaged in or performing services directly connected with the movement of trains. Train dispatchers direct the movement of all trains; telegraphers communicate orders from the dispatcher to the conductor and engineer. The tower men and block signal operators regulate the movement of trains within their several jurisdictions. Yardmen and switch tenders, as hereinafter noted, have been held within the act where their duties caused them to regulate and direct the movemnt of trains through the yards, being embraced within the words "other employes," in that portion of section 2 of the statute referring to operators, etc. Conductors, engineers, firemen, brakemen and train baggagemen constitute the crew and their every duty is connected with the movement of trains.

In Schweig v. Chicago, M. T. St. P. R. Co., 205 Fed. 96, the court held that an employe whose duties were to assist in driving cattle from the yard and chutes into cars; to place boards so that the live stock could pass from the platform into the cars; to fill the water troughs, with which some of the cars were equipped, and to put sand upon the floor of the cars did not come within the provisions of the act, and this although the stock cars were for interstate shipment. The court uses this language: "I cannot see how he can be said to have been engaged in the movement or operation of a train when he was around these stockyards. He was directed to get these cars ready for service by putting boards between the platforms and the cars, so that the cattle could pass over them into the cars. He was simply getting the car ready for movement; but he was not moving it, nor was he engaged in the movement of it. He was not engaged, within the terms of this statute, in the movement or operation of any train."

In the earlier part of the opinion, in discussing the reasons that led to the passage of this act and the persons it was intended to include, the court states: "I have examined most of the cases in this pamphlet published by the Interstate Commerce Commission, and all of them except two, as near as I can ascertain, relate to conductors, engineers, or trainmen. In one of the two cases the employe was a switchman, and in the other he was said to be a flagman, but it turned out that the flagman was really a brakeman on a passenger train. It turned out, too, that the switchman was engaged in telephoning orders from the train dispatcher, so that he came more under the head of a train dispatcher. With the exception of these two cases, I have not found a single case which comes anywhere near extending the purposes of this act to the case which we have here now. It is important, in determining what the act means, to ascertain why it was passed. The Supreme Court, in the case of Baltimore & Ohio Ry. Co. v. Interstate Commerce Commission, 221 U. S. 612, 31 Sup. Ct. 621, 55 L. Ed. 878, said:

"'The length of hours of service has direct relation to the efficiency of the human agencies upon which protection to life and property necessarily depends. This has been repeatedly emphasized in official reports of the Interstate Commerce Commission, and is a matter so plain as to require no elaboration. In its power suitably to provide for the safety of employes and travelers, congress was limited to the enactment of laws relating to mechanical appliances; but it was also competent to consider, and to endeavor to reduce, the dangers incident to the strain of excessive hours of duty on the part of engineers, conductors, train dispatchers, telegraphers and other persons embraced within the class defined by the act.'

"It is true that the Supreme Court did not undertake to name all the persons to whom the act could extend; but it seems that, in naming certain persons to whom the act does extend, it intended to indicate that to come within the act any one not named must be one who comes somewhere near being engaged in duties similar to those mentioned."

The foregoing case was affirmed by the Circuit Court of Appeals, 216 Fed. 750, and from the opinion of the latter court we quote as follows: "In riding upon the

engine, Schweig and the other employes had nothing to do with its operations or movement. Their work was entirely independent of this, and it seems clear that in performing the work, which the record shows that Schweig performed, he was neither within the spirit or the letter of the Hours of Service Act. He was neither engaged in nor connected with the movement of the train. Whether Schweig was tired and exhausted by reason of continuous service did not affect, and could not affect, the movement of the interstate train."

In speaking of the reasons leading up to the passage of the act we find this statement in United States v. Kansas City Southern Ry. Co., 189 Fed. 471: "Experience has shown that many serious accidents to trains, causing great loss of life or permanent disabilities to passengers, as well as employes, are often due solely to the fact that members of the train crew had become exhausted by reason of being required or permitted to remain on duty for too long a period, and therefore unable to give that care and attention necessary for the safety of the train. To prevent accidents from such causes the Congress, in its wisdom, enacted the statute prohibiting railroads, not only from requiring any employe subject to the act to remain on duty for a longer period than 16 consecutive hours, but also 'permitting' it."

In United States v. Pennsylvania R. Co., 239 Fed. 576 (District Court), the court held that a yardmaster in a railroad yard, to whom was given certain duties to aid and inform operators of trains and enable them to regulate and control such movements was included in the statute, buildings where the yardmaster was stationed being equipped with telephones and speaking tubes, the yardmaster directing what track should be used by the trains. The court says that there might be room for argument as to whether a yardmaster was within the act but for rule 706 of the company, which expressly classifies yardmasters among employes who give orders "affecting train movements;" for said rule expressly provides that yardmasters "have charge of the movements of trains within the parts of the yard limits assigned to their charge; and under rule 707 it is provided that freight conductors "must obey orders of yardmasters."

In the course of its opinion the court says: "We are in entire accord with him (counsel) that yardmasters do not belong to the class of dispatchers or operators who have to do with train movements. If the words 'other employes' are to be given this significance, we think the viewpoint of the defendant to be the correct one. Much may be said in support of this. It is a resulting consequence of the *ejusdem generis* doctrine. We do not think, however, the doctrine to have application. The word 'other' is, we think, not used in the sense of 'others of the same class,' but in the 'and also' sense. Congress did not command that train dispatchers and operators and other employes of the same class, but that dispatchers and operators and also all employes, whether of the same class or not, who directed train movements, and who used the telegraph or the telephone in the discharge of their duties, should be subject to this provision of the act. Under rule 706 we feel compelled to find that yardmasters 'transmit, deliver and receive by telephone orders pertaining to and affecting train movements.' "

The court admits that the case is a close one, and says: "As remarked before in other cases, a given case may require us to stand so near the dividing line that its ruling partakes too much of the character of a 'rescript' to be altogether satisfying." That even this case was the "dividing line," and a "close one," as stated by the court, is shown by Missouri Pac. Ry. Co. v. United States, 211 Fed. 893, where the Circuit Court of Appeals, in reversing the District Court for the Western District of Missouri, held that a switch tender whose duty it was to operate certain switches regulating trains, pursuant to directions given him by telephones connected with a shanty erected at his place of employment, was not embraced within the terms "other employe," in section 2 of the statute; and the railroad company was not liable for a penalty thereunder because it required such employe to work beyond the specified hours. We quote from this opinion as follows: "As the word 'employe' in the proviso of section 2 includes 'operator' and 'train dispatcher,' for the latter are both employes, the conclusion here is irresistible that Congress intended by the use of the words 'other employe' to mean an employe engaged primarily in the same class of service as would be performed by an operator or train dispatcher. If this

be the right construction to place upon the proviso, then. R. Connell and J. W. King were not in any sense employes, whose primary duty was to dispatch, report, transmit, receive or deliver by the use of the telegraph or telephone orders pertaining to or affecting train movements within the meaning of the proviso. While, as has been said before, we must give the law such a construction as will promote the purpose of the law, in our zeal to do so, however, we must not attempt to legislate ourselves. We are cited to the case of United States v. Houston Belt & Terminal Ry. Co., 205 Fed. 344, 125 C. C. A. 481. In regard to this case, it is sufficient to say that the facts which appear in the report of that case differ from the facts in the present record."

United States v. Great Northern Ry. Co., 206 Fed. 838. This was a proceeding to recover a penalty against the company for a violation of the act. The train, on which the employe involved was a fireman, was placed on a siding and there remained for a considerable period of time. All the employes except Bergen, the fireman, were relieved of all duties pertaining to the train, and he was required to remain on duty as an engine watchman. The court says: "From this abstract of the facts, as stipulated, it appears that Bergen was actually engaged as fireman a little less than 16 hours, but as fireman and engine watchman he was on duty continuously for 24 hours, and the question for determination therefore is whether, under the circumstances, his service as engine watchman brings the case within the statute. Conceding, as urged, but not deciding, that Bergen's service as engine watchman was not directly connected with the movement of the train, he was primarily a locomotive fireman, and, as such, an 'employe' as defined by the act, and was therefore subject to its operation."

In affirming the judgment of the District Court, the Circuit Court of Appeals (211 Fed. 309) held that Bergen's duties in watching the engine were in effect the same as those he performed as fireman, stating that in no sense or particular were they different; that when a locomotive is actually running, the duties of the fireman may be more strenuous and occupy his time to a greater extent than when the locomotive is tied up on a siding, but that would be merely a question of degree and would not affect the general nature of the duties of his occupation.

Chicago & Alton Ry. Co. v. United States, decided May 20, 1918, U. S. Sup. Ct. Adv. Ops., 1917-1918, page 580, was a suit to recover a penalty for violating the Hours of Service Act, by permitting a switch tender to remain on duty more than nine hours. The court thus states the duties of the employe involved: "The work of these employes is to throw switches, relieve yard, train and engine crews of this work, and to avoid delays to trains moving through the yard; the telephones are used to permit the yard master, who directs all yard movements, to keep in closer touch with such movements and to issue instructions or orders to yard, train or engine crews as to handling of cars or trains, or as to any other work that he may desire performed. The telephones at the three places were installed principally for the purpose of making more convenient communication between the yardmaster's office and said shanties." And in the concluding part of the opinion the court says: "Here, the facts disclose the switch tender on duty, for twelve consecutive hours in a shanty continuously operated night and day where, by the use of the telephone, he received and delivered orders pertaining to train movements—*not mere switching movements within the yard;* and in such service mental and physical alertness are of great importance. By permitting this the railroad violated both language and purpose of the act." Thus the court excludes from the provisions of the statute an employe engaged in switching movements within the yards.

It is claimed by appellee that appellant failed to allege that his injury was due to the fact that he was required or permitted to work for more than 16 hours, and that he does not show that the injury complained of happened beyond the 16 hour period. Because of the conclusion we have reached on the other phase of the case we do not find it necessary to discuss this question, but suffice it to say that the Supreme Court of the United States, in St. L. Iron Mtn. & S. Ry. v. McWhirter, 229 U. S. 265, has held that in order to render the carrier liable under the Hours of Service Act there must be proof showing some connection between the execessive hours of employment and the injury.

To hold that an employe, performing duties such as appellant was engaged in at the time he received the injuries complained of, was embraced within the provisions of the Hours of Service Act, would, in our opinion,

be giving to the act a construction never intended by congress.

The federal court has not gone so far. For example, they reluctantly held that a yardmaster was included, and only did so because a rule of the company stated that yardmasters performed duties pertaining to the movement of trains. A switch tender has been held not to be included in the words "other employes" in section 2, relating to operators, etc. And in another case the District Court was unwilling to decide whether a man watching an engine was included, but the Circuit Court of Appeals held that such an employe was included because he was, in effect, performing the duties of a fireman, which was said employe's regular occupation.

Aside from these cases we think the language of the Supreme Court of the United States, in the case last above cited, is conclusive of this question, where, in referring to the duties of a switch tender, who was held to come within the operator class, it is said that he received and delivered orders pertaining to train movements, *not mere switching movements within the yard*, thus drawing a distinction between the movement of trains as contemplated by the statute and mere switching movements within the yard. We can see no difference between switching movements in the yard and the cleaning of snow from switches. As we understand the work being done by appellant it was not necessary to the movement of through trains, or train movements within the intendment of the act, but was only to keep the switches in such condition in the yard at Shepherdsville that the switches might be used for switching or yard purposes. But for the yard tracks there would have been no more necessity to have cleared these switches than it would have been to keep the snow from every switch on the company's line.

We have found no case holding that a section hand or anyone engaged in similar work, was included in the act. Were we to so hold, it is difficult to conceive of any employe having outside work for the company who would not be included. The act is not so comprehensive. The reasons leading to its passage we have heretofore given. It was not the intention to give it as wide a scope as the Employers' Liability Act.

The demurrer to the petition as amended was properly sustained.

The conclusion reached, we believe, is expressive of the intention, the aim and the purpose of congress, and is in accord with all the decisions construing the act and to otherwise construe it would be to so warp and distort the language used as to give it a meaning never contemplated. This we are not willing to do.

The judgment is affirmed.