**Janet B. JOPEK, Executrix of the Estate of Donald N. Jopek, Deceased,**

v.

**NEW YORK CENTRAL RAILROAD COMPANY, a Corporation, Appellant.**

**No. 15241.**

United States Court of Appeals
Third Circuit.

Argued Oct. 8, 1965.

Decided Dec. 13, 1965.

William F. Illig, Erie, Pa. (Gifford, Graham, MacDonald & Illig, Erie, Pa., on the brief), for appellant.

John M. McLaughlin, Erie, Pa. (William C. Sennett, Knox, Pearson & McLaughlin, Erie, Pa., Joseph Rubenstein, Towne & Rubenstein, Dunkirk, N. Y., on the brief), for appellee.

Before BIGGS, MARIS and STALEY, Circuit Judges.

STALEY, Circuit Judge.

The sole question raised by this appeal is whether the district court erred in finding as a matter of law that a railroad employee whose duties were to sweep and clean certain switches was actually engaged in or connected with the movement of any train within the meaning of the Hours of Service Act, 45 U.S.C. § 61 et seq.

The relevant facts may be summarily stated as follows: Plaintiff's husband, Donald Jopek, was employed by the New York Central as a welder at its Ashtabula, Ohio, yards. At 4:30 o'clock A.M. on the morning of December 10, 1962, Jopek left his home in Dunkirk, New York, en route to his job in Ashtabula. Due to bad weather, he was unable to reach his planned destination. Consequently, he checked in at the defendant's yard in Erie, Pennsylvania. After the foreman had made a routine check with Ashtabula, Jopek was assigned certain work beginning around 7:30 o'clock A.M. He spent most of the daylight hours working in the Erie yard and on track patrol. After assisting in the replacement of a defective rail, Jopek and his co-worker, Cash, returned to the Erie depot at about 5:30 o'clock P.M. The track supervisor asked them if they would like to work that evening, and they both replied affirmatively. They were told to take an hour or so off and then to report to a place along the defendant's main line known as Harbor Creek.

Jopek and Cash arrived at Harbor Creek within the allotted time and reported to the dispatcher via telephone. At Harbor Creek there were located a number of switches on defendant's main line which, due to the cold weather and deep snow, could freeze or otherwise malfunction. The two men were to sit in one of the defendant's trucks and watch for a signal light which could be flashed by the dispatcher. When the light came on, Jopek and/or Cash would cross the tracks and pick up the phone. The dispatcher would tell them that a certain switch was not functioning properly; they would clean that switch and report back via phone. On the night and early morning in question, Jopek and Cash received four calls and cleaned three switches. Cash answered the fourth call around 3:00 o'clock A.M. and returned to the truck to discover Jopek slumped over the steering wheel apparently in an unconscious state. An ambulance was summoned; Jopek, however, was pronounced dead on arrival at the hospital. Expert testimony adduced at the trial listed the cause of death as myocardial fibrosis, a degenerative heart disease, unknown to either the deceased or the defendant. Further expert testimony also established the more immediate cause of death as overexertion and overexposure.

█ Plaintiff predicated her right to recover under the Federal Employers' Liability Act, 45 U.S.C. § 51 et seq., on two theories: failure to provide a safe place to work (general negligence) and violation of the Hours of Service Act, 45 U.S.C. § 61 et seq. (negligence per se). The district court determined as a matter of law that plaintiff's husband was an employee within the meaning of the Hours of Service Act and submitted the issue of causation to the jury along with the standard charge on failure to provide a safe place to work. The jury rendered

a general verdict [1] for the plaintiff from which this appeal followed.

■ The relevant sections of the Hours of Service Act provide that:

"It shall be unlawful for any common carrier, its officers, or agents, subject to sections 61–64 of this title to require or permit any employees subject to said sections to be or remain on duty for a longer period than sixteen consecutive hours, and whenever any such employee of such common carrier shall have been continuously on duty for sixteen hours he shall be relieved and not required or permitted again to go on duty until he has had at least ten consecutive hours off duty; and no such employee who has been on duty sixteen hours in the aggregate in any twenty-four-hour period shall be required or permitted to continue or again go on duty without having had at least eight consecutive hours off duty * * *." 45 U.S.C. § 62.

" * * * [T]he term 'employees' as used in said sections [61–64] shall be held to mean persons actually engaged in or connected with the movement of any train." 45 U.S.C. § 61.

It has been well established since the case of Atchison, T. & S. F. Ry. v. United States, 244 U.S. 336, 37 S.Ct. 635, 61 L.Ed. 1175 (1917), that the Act is remedial in nature and was passed for the protection of the public and railroad employees from the dangers inherent in long, uninterrupted periods on duty by railroad employees. The Act should be construed in the light of its purpose, Chicago & Alton R. R. v. United States, 247 U.S. 197, 200, 38 S.Ct. 442, 62 L.Ed. 1066 (1918), which has uniformly been held to mean that it should be liberally or broadly construed. United States v. Atlantic Coast Line R. R., 153 F.2d 243 (C.A.4, 1946); United States v. Balti-

more & O. R. R., 133 F.2d 831 (C.A.4, 1943); St. Joseph & G. I. Ry. v. United States, 232 F. 349 (C.A.8, 1916); San Pedro, L. A. & S. L. R. R. v. United States, 213 F. 326 (C.A.8, 1914); United States v. Northern Pac. Ry., 224 F.Supp. 303 (D.Minn., 1963); United States v. Detroit, T. & I. R. R., 205 F.Supp. 860 (E.D.Mich., 1962), rev'd on other grounds, 315 F.2d 802 (C.A.6, 1963).

For the purpose of this appeal, appellant has conceded that Jopek was on duty for more than sixteen hours. It raises no issue with regard to the consecutiveness of the hours of his employment on December 10th and 11th of 1962. Its sole contention here is that Jopek was not an employee within the meaning of the Act. It argues that Jopek was not "actually engaged in or connected with the movement of any train."

■ There is no question that if Jopek was actually engaged in or connected with the movement of any train during his final working hours on the days in question, then this case would fall under the Act. United States v. Great No. Ry., 206 F. 838 (D.Idaho, 1913), aff'd, 211 F. 309 (C.A.9, 1914), cert. denied, 234 U.S. 760, 34 S.Ct. 776, 58 L.Ed. 1580, see also Baltimore & O. R. R. v. ICC, 221 U.S. 612, 619, 31 S.Ct. 621, 55 L.Ed. 878 (1911). Comingling of duties will not avoid application of the Act. San Pedro, L. A. & S. L. R. R. v. United States, 213 F. 326. Thus, it is clear that the duties of Jopek at the time of his death must be scrutinized to ascertain coverage or nonapplicability of the Act.

The testimony of Charles D. Criscione, a track supervisor, fully described the type of work being performed by Jopek when he suffered his fatal heart attack:

"Q. What was it that they were supposed to do when they got to Harbor Creek?

"A. They were supposed to call me when they got there.

1. We believe that in a case such as this the district court should have submitted special interrogatories to the jury as provided by Rule 49. See Byrne v. Pennsylvania R.R. Co., 262 F.2d 906 (C.A.3,

1958), cert. denied, 359 U.S. 960, 79 S.Ct. 798 (1959), where it was indicated that the district court, in a situation similar to that presented here, submitted special interrogatories to the jury.

"Q. I mean after that.

"A. To watch that call light. We have a call light of remote control and when that light goes on, that is for a signal to go to that pole and see what the dispatcher wants, to see if he wants any switches to be cleaned.

\*     \*     \*     \*     \*     \*

\* \* \* On every one of these remote controls where these switches were, they control one track to another and we have a light, in other words, that rotates around and gives them signal that they want them at the pole, so these men that go there, they will sit in the truck or in the shanty there—they will go into the shanty where there is heat, a stove going all the time. Well, when that light goes on they know there is trouble and so they go on the phone and the dispatcher will tell them, 'We have trouble on track so and so and can't get that switch,' so they go out and clean that switch and when the switch starts moving over, they know they have it and they go back to the dispatcher and say, 'We have the switch going.' And he would say, 'Everything going okay?' And they say yes, and go back to the shanty or into the truck and stay there until there is a signal again, the light again. Sometimes they don't go over one hour [once] during the whole night and then, again, they can go over 15 times a night. It depends on the movement of trains, but usually, if they go out once or twice, they are lucky, during the night. But we have to have men there for emergency; the railroad has to have certain switches right away so that they can close switches on certain tracks."

In addition to this uncontradicted testimony, which was also to a large extent supported by the testimony of Charles Cash, Mr. Criscione further stated that:

" \* \* \* [T]he nightmen don't go out there and shovel those switches, because during the day we bring out other forces to do that job, and during the night all they do is try to keep that point open so that the dispatcher can throw these trains from one track to another."

Despite the wealth of appellate and lower court decisions involving the Hours of Service Act, none has outlined the criteria for determining when an employee is "actually engaged in or connected with the movement of any train." This is precisely the problem with which we are here confronted. None of the cases cited by either of the parties establish governing precedents. Neither Jones v. Louisville & N. R. R., 183 Ky. 409, 209 S.W. 350 (1919), nor Terry v. Illinois Central R. R., 285 Ill.App. 581, 3 N.E.2d 154 (1936), elaborate on the duties of the employees in question although in both cases the employees were sweeping snow from switches. Consequently, what was said there would apply to a case only where the employee was sweeping snow where such sweeping had ostensibly no connection with train movements. Although this point will be discussed more fully later, we believe that there was some connection between Jopek's duties and the movement of trains.

■ Appellant relies on the legislative history of the Act to support the proposition that Congress intended only to encompass those employees who were actually engaged in moving the trains. Assuming *arguendo* that this is so, the rule of statutory construction is clear that where the meaning of the words is plain, especially where they are consistent with the purpose of the legislation, there is no need to resort to legislative history. Ex Parte Collett, 337 U.S. 55, 61, 69 S.Ct. 944, 93 L.Ed. 1207 (1949), and cases there cited; Gemsco, Inc. v. Walling, 324 U.S. 244, 260, 65 S.Ct. 605, 89 L.Ed. 921 (1945); Essex County & Vicinity Dist. Council of Carpenters, etc. v. NLRB, 332 F.2d 636, 641 (C.A.3, 1964), and cases there cited; Baur v. CIR, 145 F.2d 338, 156 A.L.R. 560 (C.A.3, 1944).

The words chosen by Congress present no obstacle to interpretation; their meaning is plain and clearly in accord with the avowed purpose of the Act to prevent

injury to the public and railroad employees. Webster's New International Dictionary (2d ed. 1952) ascribes the following as the first two meanings of the word "actually":

"1.   Actively; also, energetically."

"2.   In act or in fact; really; also at the present moment; for the time being."

Substituting either or both of these meanings for the word "actually", it becomes clear that the purpose of the Act to eliminate or reduce railroad accidents caused by overwork could only be effectuated by encompassing all those employees who are "actively" or "presently" engaged in or connected with the movement of trains. Admittedly Congress did not intend the coverage under the Hours of Service Act to be as broad as under the Federal Employers' Liability Act. Yet, in construing the Hours of Service Act liberally, it is the word "actually" which differentiates those who are from those who are not within its scope.

■  Construing the words "engaged in or connected with the movement" with the same Congressional purpose in mind, compels the conclusion that the services or duties of the employee must proximately relate to a train or trains already in motion or about to move. Such a construction is the only one which can reconcile the limited coverage aspects of the Act with the purpose of preventing railroad accidents.

■  Analyzing the undisputed and uncontradicted testimony of Charles D. Criscione, which is quoted above, it becomes clear that Jopek was an employee within the meaning of the Act. First, it is undisputed that Jopek had worked for more than sixteen consecutive hours. Secondly, it is clear that Jopek and Cash were only required to clean those switches that were to be operated because of an approaching train. Criscione stated that they were not out there just to clean the switches, but rather, for an emergency: "to keep that point open so that the dispatcher can throw these trains from one track to another." "[Their work] depends on the movement of trains * *." We believe that the converse of the latter statement is also true: that the movement of trains depends on their work.

The testimony of Criscione, which differentiates the work performed by Cash and Jopek from that performed by the day crews, is persuasive of the result reached. On the evening of December 10th and early morning of December 11th, Jopek was not performing the duties of an ordinary maintenance-of-way employee, which normally have no direct bearing on the movement of trains. On the contrary, his duties were intimately and directly connected with the movement of trains.

■  One further point remains. Did the district court err in deciding Jopek's status as a matter of law? There appears to be some authority for the proposition that the court may decide the status of an employee within the meaning of the Hours of Service Act as a matter of law. Schweig v. Chicago, M. & St. P. Ry., 205 F. 96 (D.Minn.1913), aff'd, 216 F. 750 (C.A.8, 1914). Notwithstanding this case, the rule is clear that:

"'*   *   * where the facts are not in dispute and the evidence is direct and certain, presenting no question of credibility and leaving no sufficient ground for inconsistent inferences of fact. * * *' there exists nothing for the jury function." Kocher v. Creston Transfer Co., 166 F.2d 680, 687 (C.A.3, 1948), citing and quoting from Joseph v. United Workers Ass'n, 343 Pa. 636, 639, 23 A.2d 470, 472 (1942).

The testimony of Criscione and Cash is consistent, undisputed and raises no issue of credibility; therefore the court could properly decide the question of Jopek's status without invading the province of the jury. The law is also correctly stated in 9 Cyclopedia of Federal Procedure § 31.53 at 299 (3d ed.):

"*   *   * In other words, the question becomes one of law where

there is no dispute as to the facts bearing upon an issue or point, or as to the proper inferences to be drawn from such facts, for where a matter in issue is established by all the evidence on both sides, the jury cannot be permitted to find to the contrary. The legal effect of evidence is a question of law." (Footnotes and cases cited therein omitted.)

Here, we think that reasonable minds could not differ in the inference to be drawn from the testimony set forth above—that inference being that the work performed by Jopek was directly related to a train or trains already moving or about to move which would soon pass over the switches involved.

The judgment of the district court will be affirmed.