**John L. GREER, Sr., and wife, Russell Z. Greer,**

v.

**UNITED STATES of America.**

**Civ. A. No. 5709.**

United States District Court
E. D. Tennessee, N. D.

March 28, 1967.

On Motion for Judgment Notwithstanding Verdict May 16, 1967.

David E. Rodgers, Jackson C. Kramer, Kramer, Dye, Greenwood, Johnson & Rayson, Knoxville, Tenn., for plaintiffs.

G. Wilson Horde, Asst. U. S. Atty., Knoxville, Tenn., S. V. Reynolds, Tax Division, Department of Justice, Washington, D. C., for defendant.

## MEMORANDUM

ROBERT L. TAYLOR, Chief Judge.

This suit was filed for the refund of income taxes for the years 1961 and 1962. Plaintiffs are husband and wife and the wife is joined as a party only because she signed the income tax returns covering the years in question as required by the applicable income tax statutes. For this reason, Mr. Greer alone will be referred to and designated as the taxpayer.

The suit involves two questions. The first is whether all the 1961 and 1962 racing earnings of the race horse, Ridan, should be included in the gross income of the taxpayer for those years. By instrument dated July 26, 1961, and for the stated consideration of $550.00, taxpayer transferred and assigned to his grandson, John L. Greer, III, a one-fifth of his (the taxpayer's) one-third racing interest in the race horse, Ridan, and on the same date for a like consideration he transferred and assigned a like interest in the same race horse to another of his grandsons, Ernest Russell Greer.

This phase of the case was tried by the Court and to a jury on March 24, 1967 and the jury returned a verdict in favor of the taxpayer.

The second question is whether a foal which died five days after birth can be considered a capital asset held for more than six months, entitling the tax-

payer to capital gains treatment of the proceeds collected from insurance on the life of the foal.

The facts relating to the second issue were either stipulated or are not in dispute. This question was submitted to the Court for determination.

It is the contention of the Government that since the taxpayer owned the foal for less than six months (five days) he is not entitled to capital gains treatment under 26 U.S.C. 1231.[1]

Taxpayer contends that the insurance proceeds qualify for "involuntary conversion" (by its death) treatment of the asset and that the proceeds were properly reported as a long term capital gain since the insurance had been taken out more than 120 days after conception and more than six months before the death of the foal and that the period from inception of the insurance to the date of death exceeded six months. In support of this contention, the taxpayer asserts that since the insurance policy on the foal was issued 120 days after conception and more than six months before its death, the foal was considered to be in existence and the taxpayer had an interest in it.

Mr. E. H. Woods and taxpayer were the joint owners of a mare, Princess of Erin. This mare was bred to a stud, Traffic Judge, resulting in the conception of a foal, which, it was anticipated, would be used by taxpayer in his horse racing business. The amount of the insurance covering the unborn foal was $8,750.00. The normal gestation period for horses is eleven months, and after carrying the foal for the normal term, Princess of Erin gave birth to the foal which lived only five days thereafter. Taxpayer's share of the insurance was $4,375.00.

The Government disallowed capital gains treatment of the $4,375.00 and included it in the income of the taxpayer at ordinary income tax rates, which resulted in an additional assessment against the taxpayer. Taxpayer paid the additional assessment under protest.

It is the view of the Court that the period of time the live foal was held by the taxpayer after birth is controlling, rather than the period of time the insurance was in effect.

Section 1231 of the Internal Revenue Code of 1954 requires the property to be held for more than six months to qualify for capital gains treatment. In the opinion of the Court, the death of a five-day-old foal is not an "involuntary conversion" of a capital asset which meets the six-months time requirement.

Language used in tax statutes should be given its ordinary and natural meaning. Helvering v. San Joaquin Fruit & Investment Co., 297 U.S. 496, 56 S.Ct. 569, 80 L.Ed. 824. The Court stated that "to hold property" means to own it. But taxpayer argues that he acquired or held an interest at the time of conception and that it was conceived more than six months prior to its death.

We do not believe that Congress intended that conception of an animal start-

1. Section 1231 (a) provides in pertinent part:

"(a) *General Rule.*—If, during the taxable year, the recognized gains on sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. For purposes of this subsection—

"(2) losses upon the destruction, in whole or in part, theft or seizure, or requisition or condemnation of property used in the trade or business or capital assets held for more than 6 months shall be considered losses from a compulsory or involuntary conversion."

ed the running of the six-months period for capital gains treatment under Section 1231 of the 1954 Internal Revenue Code.

In the case at hand, taxpayer owned an interest in a mare that was in foal. The mare could have had a miscarriage, or could have died before the birth of the foal, and the foal could have been born dead. In either of these contingencies, the taxpayer could hardly have been considered the owner of a capital asset having value, even though he may have had an insurable interest.

There is a difference in the taxpayer having an insurable interest in the unborn foal and in having an ownership in a capital asset which is not in being. Insurance which has been outstanding for more than six months is not a capital asset held for more than six months. The claim does not come into existence until some contingency occurs. If the taxpayer had sold the foal on March 28— the date the foal died—he would have sold a five-day-old foal. If he had held it for six months and one day and then sold it, his claim for capital gains treatment of the proceeds from the sale would have more substance.

If the taxpayer is entitled to capital gains treatment in the present situation, animals whose gestation is longer than six months could be considered for capital gains treatment if the animals were sold six months and one day after conception but before birth.

A number of cases were cited in the brief in which the courts held that owners were entitled to capital gains treatment on the sale or exchange of animals, but in all of them the animal was held for a period of more than six months after birth. Fowler v. Commissioner, 37 T.C. 1124; Nowland v. Commissioner of Internal Revenue, 244 F.2d 450 (C.A. 4); Collings' Estate v. United States, 138 F.Supp. 837 (W.D.Ky.) Sullivan v. Commissioner, 17 T.C. 1420.

▮ The burden of proof as to the six-month holding period is upon taxpayer. Stevens Bros. Foundation, Inc. v. Commissioner of Internal Revenue, 324 F.2d 633, 647 (C.A.8).

▮ It results that the long term capital gains treatment of the insurance proceeds on the foal was properly disallowed.

### On Motion for Judgment Notwithstanding Verdict

Defendant has moved for a judgment notwithstanding the verdict or in the alternative for a new trial, in accordance with Rules 50 and 59 of the Federal Rules of Civil Procedure and urged in support of the motion for judgment four separate grounds, the first two of which relate to evidence and the burden of proof. The third ground asserts that the $1,100.00 given for two-fifths of plaintiff's one-third interest in the race horse, Ridan, was completely inadequate consideration. It is asserted in the fourth ground that defendant is entitled to a judgment in accordance with its motion for a directed verdict which was made at the conclusion of the evidence.

The grounds asserted in support of the motion for a new trial are: (1) That the verdict is against the weight of the evidence; (2) the defendant was denied trial rights because the Court should itself have decided, without submitting the question to the jury, whether plaintiff assigned his income derived from Ridan's earnings; (3) that the jury should have been instructed only on the question whether an adequate consideration was given for two-fifths of plaintiff's interest in the horse, Ridan, and not on the question whether the plaintiff assigned his income derived from Ridan's earnings.

Defendant asserts that the latter was a question of law for the Court and not a question of fact for the jury.

Reference is first made to the motion for judgment.

Plaintiff filed the suit for a refund of income taxes in the amount of $37,-467.24, plus interest, covering the calendar years 1961 and 1962. The case was

tried before the Court and to a jury on March 23 and 24, 1967 and resulted in a verdict in favor of plaintiff.

The first question presented is whether defendant is entitled to a judgment as a matter of law. A factor to be determined in finding an answer to this question is whether the total of $1,100.00 paid by the two grandchildren to John L. Greer, Sr., for a two-fifteenths interest in the racing earnings of the horse, Ridan, was adequate. If inadequate, is such inadequacy sufficient to charge John L. Greer, Sr., for income tax purposes with the earnings that were paid to the grandchildren for the calendar years 1961 and 1962?

Testimony was given by John L. Greer, Sr., and his two sons of the circumstances leading up to the transfers of the two-fifteenths interest to the grandchildren. John L. Greer, III, who was interested in horse racing, called his grandfather from Bristol, Tennessee and told him he would like to buy an interest in Ridan. At that time, John L. III was ten or eleven years old. The grandfather thought that if he sold a one-fifteenth interest to him that he should also sell a one-fifteenth interest to another grandson, Ernest Russell Greer. Plaintiff determined the price of the respective interests at $550.00, being his one-fifteenth depreciated cost in Ridan. The transfers were made on July 26, 1961.

Leroy Jolley, the trainer, determined when and where the horse ran. Mrs. Moody Jolley collected the net amount of the earnings from the horse racing officials—expenses of the horse having been deducted by them—and remitted to plaintiff. Plaintiff, in turn, turned over to William Greer, the father of Ernest and uncle of John L. III, their proportionate parts of the earnings. William is the custodian of the funds and manages them in accordance with the Uniform Gift to Minors Act, TCA 35–803(a).

Plaintiff stated that he made it known to the respective fathers of his grandchildren that they would be responsible for their proportionate part of the expenses of the horse and that they would have a voice in the management of the horse in proportion to their interests. He also stated that he advised them that horse racing was a risky business and that the grandchildren could lose on their investments. William Greer and John L. Greer, Jr., corroborated the testimony of their father on these points.

Ridan was originally owned by Tom Girdler. Plaintiff, Mrs. Moody Jolley and Ernest H. Woods purchased him for $11,000.00 in May, 1960, plaintiff paying for his one-third interest the sum of $3,666.67. Plaintiff studied the heritage of Ridan and found his ancestry had produced many champion race horses. Ridan was only one year old when purchased and had not been schooled, trained or raced. He was located at the Claiborne Farm, Paris, Kentucky, when purchased and stayed there for schooling. After schooling, he commenced training under the supervision of Leroy Jolley. The purpose of the initial training is to condition the horse so that he is able to race and keep in condition for his racing career. The schooling was paid for by the original owners, plaintiff, Mrs. Jolley and Woods.

Ridan first raced at Hialeah Race Track, Miami, Florida on February 10, 1961 and earned $2,275.00. He again raced and won on April 20, 1961 at the Keeneland Race Track, Lexington, Kentucky, and established a new track record for the distance of four furlongs in that race. He earned $2,100.00 in this race. On June 14, 1961 he won his third race at the Washington Park Race Track, Chicago, Illinois and earned $3,250.00. On June 21, 1961 he was entered in his first "stakes" race at Arlington Park Race Track, Chicago, Illinois, which he won and earned the sum of $10,425.00 for his owners. He, therefore, had won the first four of his races and had earned $18,050.00 for his owners before the execution of the assignments to the two grandsons.

On the face of the instrument to Ernest Russell Greer, it was stated that Ridan was then in training in Barn 3A, Arlington Park Race Track, Arlington

Heights, Illinois, with Leroy Jolley as trainer. Each assignment stated that the interest assigned should continue only while the horse races.

On July 29, 1961, three days after the assignments were executed, Ridan won the Arlington Futurity at the Arlington Park Race Track in Chicago, Illinois. Exhibit 15, which is a copy of the Daily Racing Form Experts' Selections, shows that Ridan was the unanimous favorite to win that race. He won easily. His time was just one-fifth of a second slower than the track record and he earned the sum of $127,050.00. On August 21, 1961 he won his sixth race of the year at Arlington Park, Chicago, and earned $10,700.00. His last race in 1961 was on September 2 which he won and earned for his owners the sum of $128,250.00. Thus, his total earnings for 1961 were $284,050.00. He had now won seven straight races without a defeat. In 1962, he won $311,477.75. The only race that he ran in 1962 in which he did not win anything was on September 24, 1962 when he was ridden by Shoemaker. In 1963 he ran three races and won $34,-130.00. In February, 1963 he sustained a leg injury and had to be retired. His total racing earnings amounted to $629,-657.75.

Since his retirement from racing, Ridan has been standing at stud at the Claiborne Farm, Paris, Kentucky. The fee for his stud service was originally $6,500.00 but has been increased to $7,-500.00. He is supposed to service thirty mares a year. In March, 1967 William Hartack, who has ridden approximately 13,000 horses since he became a jockey on April 14, 1952 testified that Ridan was the best two year old horse that he had ever ridden. Mrs. Moody Jolley testified that she was offered $250,000.00 for Ridan prior to July 26, 1961. Insurance was written on Ridan by Mr. Broadus in Lloyd's of London for $100,000.00 on July 1, 1961, some four weeks prior to the assignments to the grandsons at a figure which would have placed a total valuation upon the horse of only $7,-500.00. This insurance was increased on July 29, 1961 to $200,000.00; on September 7, 1961 to $300,000.00; on April 2, 1962 to $500,000.00 and on February 5, 1963 to $700,000.00.

Plaintiff stated that $1,100.00 for the two-fifteenths interest was adequate consideration but that he would not have sold the two-fifteenths interest to an outsider for the same price or for any price because he was selective in choosing persons as associates in business.

Plaintiff started in the horse racing business in 1955 and lost money from 1955 through 1965, except for the year 1961 when he made $28,608.21. A table was filed as an exhibit showing the income, expenses, depreciation and profits and losses during those years.[1]

The horse racing losses were deducted each year from plaintiff's earnings and profits from other business activities consisting of rentals, interests, dividends, and wages and bonuses from the Brown and Greer Company, a corporation which owns the Kern Bakeries of Tennessee, Virginia and Kentucky. Plaintiff is a

| 1. Year | Income | Expenses | Depreciation | Profits | Losses |
|---|---|---|---|---|---|
| 1955 | $ —0— | $ 456.85 | $ 103.33 | —0— | $ 560.18 |
| 1956 | —0— | 6,446.26 | 4,306.92 | —0— | 10,753.18 |
| 1957 | —0— | 15,810.78 | 6,881.67 | —0— | 22,692.46 |
| 1958 | —0— | 10,660.00 | 9,139.63 | —0— | 19,739.63 |
| 1959 | 6,661.40 | 14,430.85 | 7,504.88 | —0— | 15,274.33 |
| 1960 | 4,238.82 | 18,255.39 | 9,725.47 | —0— | 23,742.04 |
| 1961 | 75,079.53 | 34,223.08 | 12,248.24 | $28,608.21 | —0— |
| 1962 | 55,427.32 | 40,016.83 | 16,568.35 | —0— | 1,157.86 |
| 1963 | 15,389.70 | 39,205.94 | 16,605.36 | —0— | 40,421.60 |
| 1964 | 45,679.82 | 55,616.47 | 15,847.55 | —0— | 25,784.20 |
| 1965 | 77,742.85 | 71,667.71 | 16,019.25 | —0— | 9,944.14 |

successful businessman, his principal business being the operation of bakeries.

As a result of the assignments dated July 26, 1961, plaintiff's grandchildren received from the earnings of Ridan the aggregate sum of $26,141.60 in 1961 and of $27,194.38 in 1962. The grandchildren filed income tax returns for the calendar years 1961 and 1962, and paid taxes in the aggregate amount of $13,199.42 on their horse racing earnings for the two years. Plaintiff's tax liability on Ridan's racing earnings for those two years was $30,080.07. By the transfers to the grandchildren plaintiff was relieved of payment of income taxes for those years in the amount of $16,880.65.

In consideration of the question of the right to refunds of income taxes paid under protest, a number of rules have been developed, some of which are mentioned below.

■■ The burden of proof is upon plaintiff to show that the tax was illegally assessed. A rebuttable presumption exists that the taxes were properly assessed and collected. Niles Bement Pond Co. v. United States, 281 U.S. 357, 50 S.Ct. 251, 74 L.Ed. 901; United States v. Rindskopf, 105 U.S. 418, 26 L.Ed. 1131.

■ The income tax laws do not permit a taxpayer to assign the income from property or assets to another for the purpose of avoiding taxation. Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731; Corliss v. Bowers, 281 U.S. 376, 50 S.Ct. 336, 74 L.Ed. 916; Helvering v. Horst, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75; Helvering v. Eubank, 311 U.S. 122, 61 S.Ct. 149, 85 L.Ed. 81; Harrison v. Schaffner, 312 U.S. 579, 61 S.Ct. 759, 85 L.Ed. 1055.

■■ If a taxpayer retains ownership of an income-producing asset, he cannot legally assign a portion of the income from that asset or the right to receive the income therefrom. If a taxpayer is vested with the right to receive the income he cannot escape the tax on this income by any kind of anticipatory arrangement. Lucas v. Earls, supra; Commissioner of Internal Revenue v. P.

G. Lake, Inc., 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743; Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898; Harrison v. Schaffner, supra; Helvering v. Horst, supra; Helvering v. Eubank, supra; Austin v. Commissioner of Internal Revenue, 161 F.2d 666 (C.A.6); Friedman v. Commissioner of Internal Revenue, 6 Cir., 346 F.2d 506.

In Austin v. Commissioner of Internal Revenue, supra, the Court, speaking through the late Judge Martin, said:

"The reasoning and the decision of the Tax Court is, in our judgment, sound. It is well settled that the courts are not so much concerned with the refinements of title as with the actual command over the income which is taxed and the actual benefit for which the tax is paid. See Harrison v. Schaffner [and cases cited at pages 581, 582], 312 U.S. 579, 61 S.Ct. 759, 85 L.Ed. 1055, in which the Supreme Court stated (p. 580) that the decision in Helvering v. Horst, supra, and in Helvering v. Eubank, 311 U.S. 122, 61 S.Ct. 149, 85 L.Ed. 81, rested on the principle that 'the power to dispose of income is the equivalent of ownership of it and that the exercise of the power to procure its payment to another, whether to pay a debt or to make a gift, is within the reach of the statute taxing income "derived from any source whatever." ' "

This language was recently quoted by Chief Judge Weick in the case of Friedman v. Commissioner of Internal Revenue, 161 F.2d p. 668, supra, 346 F.2d 508.

In the case of Helvering v. Clifford, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788, the Court said:

" * * * Technical considerations, niceties of the law of trusts or conveyances, or the legal paraphernalia which inventive genius may construct as a refuge from surtaxes should not obscure the basic issue. That issue is whether the grantor after the trust has been established may still be treated, under this statutory scheme as the

808

owner of the corpus. See Blair v. Commissioner [of Internal Revenue], 300 U.S. 5, 12 [57 S.Ct. 330, 333, 81 L.Ed. 465]. In absence of more precise standards or guides supplied by statute or appropriate regulations, the answer to that question must depend on an analysis of the terms of the trust and all the circumstances attendant on its creation and operation. And where the grantor is the trustee and the beneficiaries are members of his family group, special scrutiny of the arrangement is necessary lest what is in reality but one economic unit be multiplied into two or more by devices which, though valid under state law, are not conclusive so far as § 22(a) is concerned." pp. 334, 335, 60 S.Ct. p. 556

See Mertens Law of Federal Income Taxation, Vol. 2—Corpus and Income—Secs. 1810–1812.

In Lucas v. Earles, supra, the Court dealt with the 1918 Revenue Act which taxed the income of every individual including "income derived from salaries, wages, or compensation for personal service * * * of whatever kind and in whatever form paid," and held that the income of a husband by way of salary and attorney's fees is taxable to him notwithstanding that by a contract between him and his wife, assumed to be valid in California where they reside, all their several earnings, including salaries and fees, are to be received, held and owned by both as joint tenants. In the course of the opinion, the Court observed:

" * * * But this case is not to be decided by attenuated subtleties. It turns on the import and reasonable construction of the taxing act. There is no doubt that the statute could tax salaries to those who earned them and provide that the tax could not be escaped by anticipatory arrangements and contracts however skilfully devised to prevent the salary when paid from vesting even for a second in the man who earned it. That seems to us the import of the statute before us and

we think that no distinction can be taken according to the motives leading to the arrangement by which the fruits are attributed to a different tree from that on which they grew." 281 U.S. pp. 114, 115, 50 S.Ct. p. 241

In the case of Corliss v. Bowers, supra, the Court dealt with Section 219(g), (h) of the Revenue Act of 1924, and in the course of the opinion observed:

"But taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed—the actual benefit for which the tax is paid. If a man directed his bank to pay over income as received to a servant or friend, until further orders, no one would doubt that he could be taxed upon the amounts so paid. It is answered that in that case he would have a title, whereas here he did not. But from the point of view of taxation there would be no difference. The title would merely mean a right to stop the payment before it took place. The same right existed here although it is not called a title but is called a power. The acquisition by the wife of the income became complete only when the plaintiff failed to exercise the power that he reserved. * * * " 281 U.S. p. 378, 50 S.Ct. p. 336

In the case of Helvering v. Horst, supra, the Court stated that the dominant purpose of the income tax laws is the taxation of income to those who earn or otherwise create the right to receive it and enjoy the benefit of it when paid. In that connection, the Court stated:

"Although the donor here, by the transfer of the coupons, has precluded any possibility of his collecting them himself he has nevertheless, by his act, procured payment of the interest, as a valuable gift to a member of his family. Such a use of his economic gain, the right to receive income, to procure a satisfaction which can be obtained only by the expenditure of money or property, would seem to be the enjoyment of the income whether the satisfaction is the purchase of

goods at the corner grocery, the payment of his debt there, or such nonmaterial satisfactions as may result from the payment of a campaign or community chest contribution, or a gift to his favorite son. Even though he never receives the money he derives money's worth from the disposition of the coupons which he has used as money or money's worth in the procuring of a satisfaction which is procurable only by the expenditure of money or money's worth. The enjoyment of the economic benefit accruing to him by virtue of his acquisition of the coupons is realized as completely as it would have been if he had collected the interest in dollars and expended them for any of the purposes named. Burnet v. Wells, supra." 311 U.S. p. 117, 61 S.Ct. p. 147

In Harrison v. Schaffner, supra, the life beneficiary of a trust assigned to her children specified amounts in dollars from the income of the truck for the year following the assignment. The Court held that the amount assigned, which was paid by the trustees to the assignees, was taxable as income to the assignor under the Revenue Act of 1928.

In the case of Commissioner of Internal Revenue v. Sunnen, supra, a taxpayer owned 80% of the stock of a manufacturing corporation and his wife owned 10%. The corporation was managed by five directors, including the taxpayer and his wife, elected annually by the stockholders. A vote of three directors was required to take binding action. In exchange for a specified royalty, the taxpayer gave the corporation non-exclusive licenses to manufacture and sell devices covered by certain patents which he owned. The licenses were cancellable by either party upon giving appropriate notice, specified no minimum royalties, and did not bind the corporation to manufacture and sell any particular number of patented devices. The taxpayer assigned his interest in the royalty agreements to his wife, who reported the income therefrom as hers. The Court held that the facts were sufficient to support

a finding by the Tax Court that the taxpayer retained sufficient interest in the royalty contracts and sufficient control over the amount of income derived therefrom to justify taxing the income as his.

The Court is aware that in many of the cases it has reviewed the taxpayer retained the ownership of the income-producing asset and assigned only the income therefrom. But the Court is impressed that if the purported assignments by plaintiff to his grandsons were for inadequate consideration he would, in effect, be retaining the ownership of the interests and assigning the income thereof.

In this connection, the Court refers to two cases which though concerned with gift taxes have considered transactions out of the ordinary course of business which raise the question of adequacy of consideration. In Commissioner of Internal Revenue v. Wemyss, 324 U.S. 303, 306–307, 65 S.Ct. 652, 654, 89 L.Ed. 958, Mr. Justice Frankfurter had this to say:

"* * * Thus on finding that a transfer in the circumstances of a particular case is not made in the ordinary course of business, the transfer becomes subject to the gift tax to the extent that it is not made 'for an adequate and full consideration in money or money's worth.' See 2 Paul, Federal Estate and Gift Taxation (1942) p. 1113."

See also Commissioner of Internal Revenue v. Bristol, 121 F.2d 129, 133 (C.A.1) where the Court said:

"Section 503, providing that a transfer shall be deemed a gift unless the transferor receives full and adequate consideration in money or money's worth, appears to mean that any transfer of property is to be treated as a gift to the extent that the transferor does not receive in return an adequate and full equivalent in money or something which can be valued in money. 'Consideration', as used in Section 503, is not the same as common law consideration; it means that when the transferor gives something

810

away and does not at the same time replace it with money of equal value or some goods or services capable of being evaluated in money, he is deemed to have made a gift within the taxing law. * * *"

The Court is cognizant that our case does not involve a gift tax, although it might have, but these cases point up some of the considerations involved in dealing with the question of adequacy of consideration.

The adequacy or inadequacy of the consideration for the transfers is the ruling factor to be considered in determining whether or not plaintiff was relieved from the payment of income taxes on the grandchildren's proportionate part of the earnings from Ridan. Was the question of adequacy of the consideration a question of fact for the jury or a legal question for the Court? If the question was one for the jury, is there any evidence to support the verdict of the jury.

The Tennessee Supreme Court has held that "what is a good and sufficient consideration is a question of law; whether it has been paid or not is a question of fact." Applewhite v. Allen, 27 Tenn. 697, 700.

The Government in its brief asserts that the question whether plaintiff received adequate consideration for the transfers "is the sole factual issue in this case and should have been the only question submitted to the jury for its consideration."

The Government asserts further that if the transfers and assignments were "bona fide arm's length transaction for adequate consideration then there would be no question that Ridan's earnings could not be taxed to the plaintiff." The reason for this is that the plaintiff would have received consideration equal in value to that which he conveyed and this is the definition of adequate consideration under Tennessee law (Farrell v. Third National Bank, 20 Tenn.App. 540, 101 S.W.2d 158) and therefore would have divested himself of ownership of the two-fifteenths interest. If the plain-

tiff no longer owned the property, he could not be taxed upon the earnings of the property.

But the Government contends that if the consideration was inadequate then plaintiff would still be liable for taxes on the earnings transferred to the grandchildren.

With respect to the incidences of ownership, the Government points out that the assignments were never recorded on any public record and that Mrs. Moody Jolley, who handled all the finances in connection with the management of the horse said she did not know plaintiff had assigned this two-fifteenths interest in the horse. The Government points out that the only rights that were assigned were those to the racing income and that plaintiff retained in himself the breeding rights, the rights in the nominating awards and in the salvage value of the horse.

As previously indicated, the transfers recite that the $550.00 consideration was one-fifth of plaintiff's depreciated cost in Ridan, while the proof showed that Ridan had not depreciated in value from the time of purchase until the time of the transfers. On the contrary, he had greatly appreciated in value because of the schooling that he had received in preparation for racing activities. He was only a yearling when purchased. Much time and money was spent on him in his schooling and training, the expense of which was paid by his owners. At the time of the assignments he was a competitive thoroughbred race horse who had won four races, had earned $18,050.00 from horse racing, had established a new track record at the Keeneland Race Track and was the heavy favorite to win the rich Arlington Futurity at Arlington Park in 1961. And several weeks before the assignments, Ridan was insured for $100,000, plaintiff's interest therein being $33,333.33. One-fifth of that amount (being the percentage of ownership assigned to each grandson) was $6,666.66 and not $550.00. These factors show beyond doubt that Ridan had greatly appreciated

in value from the time of his purchase to the date of the transfers and that his market value was greatly in excess of the book value and bore little resemblance to plaintiff's stated depreciated value. The offer that had been received for him and the insurance carried on him support this conclusion.

Plaintiff argues that the horse racing business is speculative and that Ridan could have injured himself at any time, as in fact he did injure himself in 1963 which took him out of the racing business; that only the racing qualities were assigned and not the stud qualities of the horse. The Government concedes that horse racing is a speculative business (and) that racing qualities (and stud) qualities can be assigned separately. But nevertheless, and in spite of the speculation involved, Ridan could have been sold for $250,000.00 and the two-fifteenths interest in him would have been worth $33,333.33 and not $1,100.00.

But plaintiff says that only the racing qualities were sold and that the $33,-333.33 attributable to the two-fifteenths interest in Ridan would have to be separated into the racing and stud qualities of Ridan. Plaintiff says that the two-fifteenths interest of the racing interest of Ridan was worth $1,100.00. This argument would attribute a value of $32,-233.33 on the stud qualities.

Such allocation of values is hardly justified by the facts of the racing industry. Before a horse can successfully be used as a stud horse, he has to have a reputation as a successful race horse. Ridan had established himself, or was in the process of establishing himself, as a great race horse on July 26, 1961, the date the assignments were made. Hartack, a jockey of note, said that in July, 1961, Ridan was the best two year old he had ever ridden.

The Court concludes from the foregoing facts that the $1,100.00 aggregate paid by the grandchildren to the plaintiff for a two-fifths interest in the one-third interest owned by plaintiff was an inadequate consideration and that this is a question of law for the Court since there is no dispute as to the facts. Farrell v. Third National Bank, supra.

The Court is further of the opinion that plaintiff did not by the transactions of assignment divest himself from his interest in Ridan so as to avoid payment of taxes on the proportionate part of his horse racing earnings that were transferred to the grandchildren.

Attention is now directed to the motion for a new trial.

In the first ground, it is urged that the verdict is against the weight of the evidence. The basic facts were not disputed and some of them were stipulated. It is the opinion of the Court: that it erred, in not sustaining the motion to withdraw the case from the jury made by the defendant at the conclusion of plaintiff's proof, which motion was renewed at the conclusion of all of the proof, for the reason that the evidence failed to create a factual issue for the determination of the jury. The Court has corrected this error by sustaining a motion for a judgment in favor of the defendant notwithstanding the verdict of the jury.

Ground No. 2 asserts that the defendant was denied a proper mode of trial. This is based on the premise that the question whether plaintiff assigned his income derived from Ridan's earnings is a question of law for the determination of the Court. The Court concurs and has now held that this was a question of law for the Court.

Ground No. 3 asserts that the jury was erroneously instructed. In the opinion of the Court, this ground is lacking in merit. If the Court is in error in its opinion that the determination of the adequacy of the consideration is a question of law and that that question should have been left to the jury, then the Court is further of the opinion that the jury was properly charged.

The motion for a new trial is conditionally denied for the reason that if the appellate courts hold that the Court is in error in holding that the testimony was insufficient to create issues for the

jury, then the verdict of the jury will stand as the defendant received a fair trial and the Court did not commit prejudicial error in its charge.

There has been passed to the Clerk this day an order putting into effect the findings and conclusions reached in this memorandum opinion.