John L. GREER, Sr., and wife, Russell Z. Greer, Plaintiffs-Appellants,

v.

UNITED STATES of America, Defendant-Appellee.

No. 18218.

United States Court of Appeals Sixth Circuit.

March 21, 1969.

Jackson C. Kramer, and David E. Rodgers, Knoxville, Tenn., for appellants; Kramer, Dye, Greenwood, Johnson & Rayson, Knoxville, Tenn., of counsel.

Richard C. Pugh, Atty., Dept. of Justice, Washington, D. C., for appellee; Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, Myron C. Baum, Carolyn R. Just, Attys., Dept. of Justice, Washington, D. C., on brief; John H. Reddy, U. S. Atty., Knoxville, Tenn., of counsel.

Before EDWARDS and COFFIN,[*] Circuit Judges, and CECIL, Senior Circuit Judge.

CECIL, Senior Circuit Judge.

The plaintiffs-appellants, John L. Greer, Sr., and his wife, Russell Z. Greer, brought this action in the District Court against the United States for a refund of income taxes, in excess of $37,000, alleged to have been illegally assessed and collected. Mrs. Greer is a party only because she signed joint income tax returns with her husband for the tax years in question. For this reason we will refer to Mr. Greer alone as the taxpayer.

At the time this cause of action arose, and for several years prior thereto, the taxpayer was, in addition to his bakery business, engaged in the business of racing, breeding and raising thoroughbred race horses. In the course of this business two separate transactions occurred which give rise to the questions presented on this appeal.

The first of these transactions involves the transfer by the taxpayer of a portion of his one-third interest in a race horse known as Ridan. A Mr. E. H. Woods, Mrs. Moody Jolley, wife of the taxpayer's trainer, and the taxpayer purchased Ridan in 1960, for eleven thousand dollars ($11,000), the taxpayer's share being $3,666.67. After the horse was trained and began racing, he won his first four races. In these races he earned $18,050 for his owners, netting above expenses $1,766.28 each.

Mr. Greer's grandson, John L. Greer III, had displayed an interest in his grandfather's racing business and in June or July of 1961 called his grandfather seeking to purchase an interest in Ridan. After some negotiations, handled by Mr. Greer's son William, a racing interest in 1/15 of the horse, or 1/5 of Mr. Greer's share was sold to each of Mr. Greer's grandsons, John III and Ernest Russell, aged ten and five years, respectively. The consideration, which was in fact paid to the taxpayer, was $550 from each grandson. The sale was of a racing interest only, which carried with it the responsibility for sharing the expense of maintenance and the privilege of sharing the income, both proportionately, according to the respective interests. The interest of the grandsons would terminate whenever, for any cause, Ridan was through racing. It is not uncommon in the racing business to sell the racing interests separately from the breeding and other interests.

Except for the assignment of the two-fifths racing interest, the taxpayer retained his entire one-third interest in Ridan, including the breeding rights, rights to nomination awards and the salvage value of the horse. The horse remained in the custody of his trainer, Mr. Leroy Jolley, son of Mrs. Jolley, one of the co-owners. The trainer made all decisions as to when the horse would race and where. Mrs. Jolley kept the books with respect to expenses and earnings, paid the expenses and remitted one-third of the net profit to the taxpayer. The earnings were more than enough to pay the maintenance of Ridan and the grandsons did not have to pay anything out of their pockets for his support. Mrs. Jolley did not know of the grandsons' interest in the horse.

---

[*] Honorable Frank M. Coffin, Circuit Judge, First Circuit, sitting by designation.

On the date of the assignment of the taxpayer's two-fifths racing interest to his grandsons, Ridan was the unanimous favorite to win the Arlington Futurity at the Arlington Park Race Track in Chicago, which was scheduled to be run three days later. Ridan won this race and a purse of $127,050 for his owners. He earned for his owners a total of $284,050 in 1961, $311,477.75 in 1962 and $34,130 in 1963. In February 1963, he sustained a leg injury and had to be retired from racing. During his racing career, he earned for his owners $629,657.75. Following his racing career, Ridan had a substantial value to his owners for breeding purposes but we are not concerned with that here.

The grandsons' interest in the horse was completely extinguished with the injury in February of 1963. They received from the earnings of Ridan the aggregate sum of $26,141.60 in 1961 and $27,194.38 in 1962. They filed income tax returns for the years of 1961 and 1962 and paid total taxes in the amount of $13,199.42. The taxpayer's son William received and invested the grandsons' money for them.

Mrs. Jolley testified that she was offered $250,000 for Ridan prior to the date of the assignment to the grandchildren. Also prior to the date of the assignment Ridan was insured for $100,000. Beginning July 29, 1961 this insurance was increased in successive steps from $100,000 to $200,000, to $300,000, to $500,000, and finally to $700,000 on February 5, 1963.

The facts as above outlined are not in dispute. The collector of internal revenue made deficiency assessments against the taxpayer of $17,401.53 for the year 1961 and $14,866.05 for the year 1962. Part of the assessment for the year 1962 was for a separate transaction which we will discuss later. The basis of the assessments was that the taxpayer retained the income producing property and assigned only a portion of the income without adequate consideration. The taxpayer paid the deficiencies and brought this action in the District Court for refund. A trial before a jury resulted in a verdict for the taxpayer. The trial judge then granted defendant's motion for judgment notwithstanding the verdict, in an opinion reported at 269 F. Supp. 801, and the taxpayer appealed.

■■ There is a rebuttable presumption that the taxes were legally assessed and collected. The burden is upon the taxpayer to prove that they were illegally assessed. Niles Bement Pond Co. v. United States, 281 U.S. 357, 50 S.Ct. 251, 74 L.Ed. 901; United States v. Rindskopf, 105 U.S. 418, 26 L.Ed. 1131.

■■ A taxpayer cannot retain the ownership of income producing property and legally assign or give away a portion of the income only therefrom, and escape taxation thereon. In Helvering v. Horst, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75, the Court held that where a taxpayer gave away the interest coupons from bonds before they were due he gave away only the income and not the income producing property and that he was therefore liable for the tax on the income from the coupons as earned income from the income producing property. See also, Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731; Commissioner of Internal Revenue v. P. G. Lake, Inc., 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743; Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 68 S.Ct. 715, 92 L. Ed. 898; Harrison v. Schaffner, 312 U.S. 579, 61 S.Ct. 759, 85 L.Ed. 1055; Helvering v. Eubank, 311 U.S. 122, 61 S.Ct. 149, 85 L.Ed. 81; Austin v. Commissioner of Internal Revenue, 161 F.2d 666 (C.A.6), cert. den. 332 U.S. 767, 68 S.Ct. 75, 92 L.Ed. 352; Friedman v. Commissioner of Internal Revenue, 346 F.2d 506 (C.A.6). If a taxpayer is vested with the right to receive the income he cannot escape the tax on this income by any sort of anticipatory arrangement.

The question here is whether the taxpayer made a bona fide sale of a portion of the income producing property, or whether because of an inadequate consideration the assignment was of the income only.

■ We come now to the question of the adequacy of the consideration. If it is wholly inadequate, as we conclude that it is, it would, in effect, amount to retaining ownership of the income producing property and assigning the income therefrom. Under such circumstances the taxpayer would be liable for the tax on the entire income.[1] The facts of this case seem to us most analogous to the gift of bond coupons in Helvering v. Horst, supra, i. e., a transfer only of income.

■ The government argues:

"If the consideration paid by the children had been equal to the fair value of the income interests transferred to them, then this consideration—representing the value of the income rights transferred—would have been taxable in full to the taxpayer and there would be no need to invoke assignment of income principles to prevent tax avoidance through the shifting of the income."

The taxpayer returned for income tax purposes the $1,100 he received as consideration for the transfers. It was recited in the transfers that the consideration of $550 represented the depreciated book value in the hands of the taxpayer of a one-fifteenth interest in Ridan, based on his cost of $3,666.67.

It is obvious from the undisputed facts that Ridan had not depreciated in value from the time of purchase to the date of the transfer of the racing interests to the grandsons. He was only a year old at the time of the purchase. At the time of the transfer he had been schooled and trained for racing, had won the first four races in which he was entered and was insured for $100,000. Much time and money had been spent on him for schooling and training, the expense of which was borne by his owners. In ad-

dition an offer of $250,000 had been made for him. Although the taxpayer claims that he did not know of this offer, he certainly knew of the increasing value of the horse. The fact that the insurance was stepped up successively from $100,000 to $700,000, would be mute testimony of Ridan's appreciating value.

The taxpayer argues that horse racing is a speculative business and that the horse might injure itself at any time and have to be retired from racing. It seems that it was reducing risk to the minimum to make the transfer three days before Ridan was scheduled to run in a race where he was the unanimous favorite to win a purse of $127,050 for his owners. This race alone grossed $8,470 for each of the grandsons on their investments of $550. Mr. Kenneth M. Whitlock, Sr., testified that the taxpayer told him that he would not have sold the racing interests that he sold to his grandchildren to an outside interest for the same price, or for any price. Mr. Greer denied making the statement. In Helvering v. Clifford, 309 U.S. 331, 335, 60 S.Ct. 554, 556, 84 L.Ed. 788, the Court said:

"And where the grantor is the trustee and the beneficiaries are members of his family group, special scrutiny of the arrangement is necessary lest what is in reality but one economic unit be multiplied into two or more by devices which, though valid under state law, are not conclusive so far as § 22(a) is concerned."

See also, Commissioner of Internal Revenue v. Sunnen, *supra*; Central Nat'l Bank v. Com'r of Internal Revenue, 141 F.2d 352 (C.A.6).

Finally, the question arises whether the government was entitled to judgment as a matter of law.

---

1. Section 2512(b), Title 26, provides:
"Where property is transferred for less than an adequate and full consideration in money or money's worth, then the amount by which the value of the property exceeded the value of the consideration shall be deemed a gift, and shall be included in computing the amount of gifts made during the calendar year."

A gift to the grandsons would not relieve the taxpayer from the payment of taxes on the income which is the subject of the gift.

As we have said above, the facts relative to the adequacy of the consideration are undisputed. They lead to the inescapable conclusion that the consideration was not commensurate with the value of the interests purported to be transferred to the taxpayer's grandsons. In Brady v. Southern Ry. Co., 320 U.S. 476, 479, 64 S.Ct. 232, 234, 88 L.Ed. 239, the Court said:

"When the evidence is such that without weighing the credibility of the witnesses there can be but one reasonable conclusion as to the verdict, the court should determine the proceeding by non-suit, directed verdict or otherwise in accordance with the applicable practice without submission to the jury, or by judgment notwithstanding the verdict. By such direction of the trial the result is saved from the mischance of speculation over legally unfounded claims."

See also, Patterson v. Pizitz, Inc., 353 F. 2d 267 (C.A.5), cert. den. 383 U.S. 910, 86 S.Ct. 895, 15 L.Ed.2d 666; Jopek v. New York Central Railroad Co., 353 F.2d 778 (C.A.3); Compton v. United States, 377 F.2d 408 (C.A.8); Appleman v. United States, 338 F.2d 729 (C.A.7), cert. den. 380 U.S. 956, 85 S.Ct. 1090, 13 L. Ed.2d 972.

Counsel for the taxpayer cite Publicker v. Commissioner of Internal Revenue, 206 F.2d 250, to support the claim that adequacy of consideration is a question of fact to be determined by the jury. There the court held that in determining value the standard to be applied is a question of law but the standard having been applied the determination of value is a question of fact. Contrary to our case where the evidence on adequacy of consideration is not in dispute, the evidence in the *Publicker* case was highly conflicting. Obviously that presented a question of fact. We hold in the case at bar that reasonable minds could reach but one conclusion—that the consideration was inadequate.

█ The trial judge having denied defendant's motion for a directed verdict at the close of all the evidence properly

reconsidered the question on motion for judgment notwithstanding the verdict (Rule 50(b) F.R.Civ.P.). We affirm the judgment of the District Court as to the first issue presented on this appeal and hold that the taxpayer is liable for the payment of income taxes on the proportionate part of his horse racing earnings that were transferred to his grandsons.

The second transaction which gave rise to a deficiency assessment against the taxpayer, and which is the subject of his appeal herein, involves the proceeds of an insurance policy on the life of a foal which lived only five days after birth. The taxpayer considered the foal a capital asset held for more than six months and took capital gains treatment on the proceeds collected from the insurance on the life of the foal. The commissioner made a deficiency assessment on the basis that the proceeds of the insurance policy was subject to tax as ordinary income. The taxpayer paid the deficiency and sought a refund in the District Court. The issue was tried to the Court without a jury.

Facts found by the trial judge which were either stipulated or are not in dispute are as follows: "Mr. E. H. Woods and taxpayer were the joint owners of a mare, Princess of Erin. This mare was bred to a stud, Traffic Judge, resulting in the conception of a foal, which, it was anticipated, would be used by taxpayer in his horse racing business. The amount of the insurance covering the unborn foal was $8,750. The normal gestation period for horses is eleven months, and after carrying the foal for the normal term, Princess of Erin gave birth to the foal which lived only five days thereafter. Taxpayer's share of the insurance was $4,375." The insurance was issued one hundred twenty days after conception and more than six months before the death of the foal.

The sole question here is whether the foal was in existence, after conception and before birth, so as to meet the requirement of Section 1231(b) (1), Title 26, U.S.C. "property used in the trade or business, of a character which is sub-

ject to the allowance for depreciation provided in section 167, held for more than 6 months, * * *." We agree with the trial judge that it was not.

This presents a novel question and so far as we know is one of first impression. The government concedes that had the foal lived for six months the proceeds of the insurance paid upon its death would have been subject to tax at long term capital gains rate.

■ It is argued on behalf of the taxpayer that the fact that an insurance policy was issued on the foal after conception is indisputable proof that normal practice in the horse racing business is to consider the foal in existence and that the owner has an interest in it. The law is well settled that the subject matter of an insurance policy must be in existence when the policy is written and the insured must have an insurable interest in the subject matter of the policy. It is further argued that in the law's never ending evolution it has come to recognize the existence of right, title and interest in unborn animals.[2]

■ An insurable interest is not necessarily the equivalent of property that meets the requirements of Section 1231(b) (1) for tax as long term capital gains. Section 1231 applies only to property "used in trade or business." It is the foal after birth that must be held for six months and not the mare with foal. Until the foal was born the taxpayer had no property interest in the foal as such, only a property interest in a mare with a foal. Until birth, there was no certainty that the taxpayer would ever own any property interest in the foal. It is not enough to conjure up a hypothetical course of dealing in unborn foals; theoretical possibility is not the equivalent of actuality. To reduce the taxpayer's argument to reductio absurdum, if the

property interest in the foal begins with conception, then gestation would need last only six months out of eleven, and if the mare had a miscarriage four months before time for birth, the taxpayer would have held qualifying property for the required six months. Furthermore, Section 1231 requires that the property must be subject to depreciation for a period of six months before it can qualify for special tax treatment on its involuntary conversion. The foal would not have been depreciable prior to its birth. It would be impossible to satisfy the requirement of Treasury Regulation 1.167(a)–1(b) of estimating the period over which the asset may reasonably be expected to be useful to the taxpayer. For example, before birth one cannot say whether the future horse will be useful for racing, breeding, work, or—indeed—no purpose. We cannot agree with taxpayer that an unborn foal can constitute property used in a trade or business and subject to an allowance for depreciation under Section 167 and that it is, therefore, an asset as defined in Section 1231(b) (1).

In Helvering v. San Joaquin Fruit & Investment Co., 297 U.S. 496, 499, 56 S.Ct. 569, 570, 80 L.Ed. 824, rehearing den. 297 U.S. 728, 56 S.Ct. 666, 80 L.Ed. 1011, it was stated:

"Language used in tax statutes should be read in the ordinary and natural sense."

We think the term "property" as used in the statute and applicable to the facts of this case means the existence of a live foal after birth. Any other construction would do violence to the intent of Congress to allow a taxpayer to take capital gains treatment in a disposition of a capital asset that was held for a six-month period. We are unwilling to hold that a property interest in an animal

2. In this connection counsel cite Section 47–9–204(2) (a) of the Tennessee Code Annotated which provides, "A security interest cannot attach * * * in the young of livestock until they are conceived; * * *." This is a part of the Uniform Commercial Code. It defines

what may be a security interest upon agreement of parties. Like an insurable interest it cannot be equated with property that meets the requirements of Section 1231(b) (1) for tax as long term capital gains.

sufficient to meet the requirements of Section 1231(b) (1) can begin before the birth and actual existence of the animal.

Judgment of the District Court is affirmed.

COFFIN, Circuit Judge (concurring).

I concur in the result reached by the court's opinion concerning the transfer of the "racing interests"; however, I would have reached that result in a slightly different fashion.

As I understand the law in this area, the first question is whether the "racing interest" was income-producing property or merely income. If it was the former, the taxpayer would prevail whether or not the consideration was adequate, Blair v. Commissioner of Internal Revenue, 300 U.S. 5, 57 S.Ct. 330, 81 L.Ed. 465 (1937). Of course, if the consideration was not adequate, the taxpayer would be subject to a gift tax—but that is not before us. If the "racing interest" was income, then we reach the question of adequacy of consideration. If it was adequate, the taxpayer has paid his proper due to the government, Rhodes Estate v. Commissioner of Internal Revenue, 131 F.2d 50 (6th Cir. 1942); if not, the government is entitled to retain the taxes paid under protest on the actual winnings.

I agree that the "racing interests" were *not* income-producing property. I do not believe, however, that this conclusion is in any way related to the adequacy of consideration. Rather, I think that it is not income-producing property because there is lacking, as a practical matter, even the rights to enforce a trust which inhere in its beneficiaries. *See* Blair, *supra*. Indeed, the facts of this case are most analogous to the gift of bond coupons in Helvering v. Horst, *supra*, i. e., a transfer only of income.

This being so, I agree with the court's finding that the consideration was inadequate, and that, therefore, the taxpayer is liable for the tax on the income from the "racing interests".